22 N.J. Super. 45 (1952)
91 A.2d 588
ARTHUR TZESES AND LEO TZESES, DOING BUSINESS AS TZESES BROS., PLAINTIFFS-RESPONDENTS,
v.
THE BOARD OF TRUSTEES OF THE VILLAGE OF SOUTH ORANGE, ET AL., DEFENDANTS-APPELLANTS.
MARSHALL F. RUSH AND EVELYN C. RUSH, PLAINTIFFS-APPELLANTS,
v.
BOARD OF ADJUSTMENT OF THE VILLAGE OF SOUTH ORANGE, ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1952.
Decided October 6, 1952.
*48 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Ward J. Herbert argued the cause for all appellants (Mr. Ward J. Herbert, attorney for defendants-appellants The Board of Trustees of the Village of South Orange, et al., and Mr. Murray E. Kempler, attorney for plaintiffs-appellants Marshall F. Rush and Evelyn C. Rush).
Mr. Bernard Hellring argued the cause for defendants-respondents (Messrs. Greene & Hellring, attorneys for defendants-respondents Board of Adjustment of the Village of South Orange, et als.).
*49 Mr. Daniel Leff argued the cause for plaintiffs-respondents Arthur Tzeses and Leo Tzeses, doing business as Tzeses Bros.
The opinion of the court was delivered by GOLDMANN, J.A.D.
These appeals arise by reason of a variance granted by the Board of Adjustment of South Orange permitting the subdivision of the Tzeses property, commonly known as 175 Irving Avenue, South Orange, N.J., into two 73 1/2-foot-front lots and the erection of a house on each lot; and because of the subsequent action of the Board of Trustees of South Orange in declaring the action of the board of adjustment illegal and directing the building inspector to deny the building permits.
The lot in question is shaped in the form of a reversed and inverted "L," whose vertical fronts 147 feet on the north side of Irving Avenue and is about 300 feet deep. The horizontal of the "L" is a 46' x 143' strip running westwardly and at right angles from the vertical, along the rear of the adjoining premises owned by the plaintiffs Rush and known as 163 Irving Avenue. This strip of land connects with a 14-foot private right-of-way on the far side of the Rush property giving access to Irving Avenue. The entire L-shaped tract contains over 51,000 square feet.
No. 175 Irving Avenue is located in the Montrose section of South Orange, which comprises a rather large portion of the entire village and contains many fine homes located on large plots. The property is a vacant lot on which there once stood a one-family residence purchased by John C. Brahney and Marie C. Brahney, his wife, in November 1937. The Brahneys demolished the dwelling and accessory buildings some time after they took title. The lot is located near the center of a large district designated by the South Orange zoning ordinance, adopted in 1949, as a "Residence A-100 District." The zoning ordinance permits only one-family residences in such a district and requires lots to have a minimum frontage of 100 feet and a minimum area of 10,000 square feet.
*50 At the beginning of 1951 the owner of 175 Irving Avenue was Marie C. Brahney, widow. She had a tentative contract to sell the property to Arthur Tzeses and Leo Tzeses, doing business as Tzeses Bros. The Tzeses brothers, acting in the name of Marie C. Brahney, applied to the board of adjustment for a variance permitting the erection of three one-family houses upon the property. The tract was to be divided into three lots, the first having a frontage of 73 1/2 feet on Irving Avenue and a depth of 200 feet, the second being exactly like the first, and the third being in the rear of these two lots, having no street frontage but with access to Irving Avenue over the mentioned private right-of-way. The Tzeses' application was heard by the board of adjustment on January 12, 1951. There were objections from a number of property owners in the neighborhood, and in addition a petition signed by 12 owners and residents in the vicinity was received, urging that the application be refused because it would violate the zoning plan and in the future make it more difficult to maintain the high quality of the neighborhood. Following the hearing, the board of adjustment, pursuant to R.S. 40:55-39(d), as amended, recommended to the board of trustees that the variance be granted because strict adherence to the provisions of the zoning ordinance would work undue hardship on the owner in that it would compel him to use 51,012 square feet for the erection of only a single dwelling. The board of adjustment noted that the proposed division would make three plots, two containing 14,720 square feet each and the third 21,572 square feet, each of which would be larger than the 10,000-square-foot plots contemplated by the zoning ordinance.
The board of trustees of the village reviewed the recommendation of the board of adjustment, inspected the property and studied the tax map for the purpose of comparing other residential properties in the area. At its regular meeting held February 19, 1951, the board of trustees by formal resolution disapproved the recommendation and denied the *51 application for subdividing the property. No appeal was taken from that determination.
On March 6, 1951 the Tzeses brothers entered into a written contract with Marie C. Brahney for the purchase of 175 Irving Avenue, the contract being conditional upon the granting of a variance by the board of adjustment to permit subdivision of the tract. Thereafter, on May 23, 1951, they applied to the building inspector of South Orange for two building permits, which were denied. On June 7, 1951 they made a new application to the board of adjustment, requesting a variance permitting the erection of two one-family houses, the frontage to be equally divided between them, making two lots of approximately 73-foot frontage and 200-foot depth. This application made no mention of the area remaining in the rear, but it is to be noted that if the application had been granted as applied for, it would of necessity have created a third lot, thus making all three lots identical with those proposed in the first application heard on January 12, 1951. The Tzeses then took title to the premises on June 22, 1951, the conveyance being without reservation or reference to the granting of a variance.
The board of adjustment held a hearing on the Tzeses' application on June 29, 1951. A number of property owners in the neighborhood spoke in opposition to the granting of the variance, and the board had before it a petition signed by 34 residents or property owners of the vicinity opposing the application. After hearing the respective counsel for the village, the owners and the objectors, the board suggested and permitted the application to be amended so that it included the entire premises. The amended application called for the subdivision of 175 Irving Avenue into two lots, each having a frontage of 73 1/2 feet and running the depth of the lot, with two 23-foot-wide strips across the rear leading from each lot to the private right-of-way giving access to Irving Avenue. The board then granted a variance authorizing this subdivision, the result of which was to create two lots of approximately 26,000-square-foot area. In allowing the *52 variance, the board acted pursuant to R.S. 40:55-39(c), as amended, rather than under R.S. 40:55-39(d), as it had on the previous occasion when it recommended a variance to the village board of trustees.
At a meeting specially called for July 2, 1951, the board of trustees considered the action which had been taken three days before by the board of adjustment. It had before it the record of the decision of the board of adjustment as it then stood. This record contained none of the findings called for by R.S. 40:55-39(c), as amended. However, at some date subsequent to July 2, 1951, and in a manner which still remains unexplained, the statement of the board of adjustment was enlarged to read that
"the application as amended be adopted without recommendation to the Board of Trustees as the property in question contains over 52,000 square feet presented special conditions unique to this property alone, as distinguished from conditions affecting the whole neighborhood, and the special reason for the Board's action is the exceptional and undue hardship placed upon the owners thereof if strict application of the ordinance be adhered to in that only one dwelling could be erected thereon, while a number of the property owners in the immediate vicinity can or have erected a dwelling on approximately 10,000 square feet."
The board of trustees at its special meeting heard counsel for the applicant as well as counsel for the village. The latter argued that the decision of the board of adjustment contained none of the findings required by the statute which were a necessary prerequisite to valid action, and that there was no showing of exceptional or undue hardship upon the owner of the property. The trustees then unanimously adopted a resolution which, after noting the absence of statutory findings, declared the action of the board of adjustment illegal for lack of jurisdiction, and directed the building inspector to withhold issuing any building permit to the Tzeses brothers except one permitting the use of the property as a single lot on which a single one-family residence might be erected in accordance with the zoning ordinance. Thereafter Tzeses Bros., on July 31, 1951, applied for a building permit in *53 accordance with the decision of the board of adjustment. The permit was denied.
On July 27, 1951 the plaintiffs Rush, owners of 163 Irving Avenue, filed their complaint in lieu of prerogative writ against the board of adjustment, the building inspector and Tzeses Bros., to test the action of the board of adjustment in granting the variance. On August 1, 1951 the Tzeses brothers, in turn, filed their complaint in lieu of prerogative writ against the village board of trustees and the building inspector, to test the validity of the resolution adopted by the board of trustees on July 2, 1951. After answers had been filed the two cases were, by orders dated September 7, 1951, "consolidated for the purposes of pretrial and trial." While both cases were pending and prior to hearing, the board of adjustment, having filed an answer through its own counsel, held a meeting on October 8, 1951, without notice, and adopted supplemental findings in support of its decision. These findings were filed in the cause on October 15, 1951.
The consolidated actions were, on December 7, 1951, submitted for trial by the court on the pleadings, pretrial order, the supplemental findings of the board of adjustment and an affidavit submitted on behalf of the board of trustees which, it was agreed, should be accepted in lieu of testimony. It was also stipulated that the court would view the property and the surrounding neighborhood. Subsequently the court filed its opinion affirming the action of the board of adjustment and declaring the action of the board of trustees ultra vires and illegal, with directions to the building inspector to grant a permit pursuant to the determination of the board of adjustment. Final judgment in accordance with the opinion was entered January 19, 1952.
That part of the judgment below setting aside the resolution of the Board of Trustees of the Village of South Orange adopted at the special meeting of July 2, 1951, is affirmed. R.S. 40:55-39(c), as amended by L. 1948, c. 305, § 6, authorized a board of adjustment to grant a variance from the strict application of the zoning ordinance under the conditions *54 therein set forth. It eliminated the requirement of a recommendation by the board to the governing body of the municipality, contained in the Zoning Act prior to the 1948 amendment, where the specific provisions of subsection (c) were invoked. (The further amendment of that section by L. 1949, c. 242, § 1, merely recast the language of R.S. 40:55-39, as amended by the 1948 act, so that the proviso set out in subsection (c) of the 1948 amendment became applicable to all subsections of R.S. 40:55-39.) Home Builders Ass'n. of Northern New Jersey v. Borough of Paramus, 7 N.J. 335 (1951).
The power of a board of adjustment acting under R.S. 40:55-39(c), as amended, stems directly from the statute, and may not in any way be circumscribed by the municipal governing body. Duffcon Concrete Products, Inc. v. Borough of Cresskill, 1 N.J. 509, 515-516 (1949). In Kurowski v. Board of Adjustment of Bayonne, 11 N.J. Super. 433 (App. Div. 1951), the Appellate Division unanimously affirmed the judgment of the Law Division on the opinion below of then Judge William J. Brennan, Jr., who said, at page 443:
"* * * Zoning boards are not agencies of local governing bodies. They are statutory creations performing quasi-judicial functions. Subparagraphs (c) and (d) [of R.S. 40:55-39] delineate their powers either to grant or to recommend variances in permissible cases and the choice is that of the board, conditioned in either case on the existence of facts bringing the property within the requirements of subparagraph (c). Lynch v. Hillsdale, supra [136 N.J.L. 129 (Sup. Ct. 1947), affirmed 137 N.J.L. 280 (E. & A. 1948)]; Oliva v. Garfield, supra [1 N.J. 184 (1948)]; Giordano v. Newark, 2 N.J. Super. 45 (App. Div. 1949); affirmed, 2 N.J. 585 (1949)."
The special resolution of the board of trustees declaring the determination of the board of adjustment illegal "for lack of jurisdiction" was without foundation in law and invalid.
We turn now to the appeal of the plaintiffs Rush. Three of the issues raised by the pleadings and pretrial order may be disposed of preliminarily. The first is that the *55 determination of the board of adjustment was illegal because the Tzeses' application had been disposed of by action of that board and the village board of trustees earlier in 1951. The fact is that the second application, heard by the board of adjustment on June 29, 1951, requested a variance permitting the construction of two houses, whereas the earlier application involved three houses and an entirely different arrangement of the property. The variance granted was not the same kind of a variance for which an application was made several months earlier, and it was therefore not barred by the denial of the earlier application.
Secondly, appellants Rush argue that the board of adjustment acted improperly at the June 29 hearing in suggesting and permitting amendment of the application so as to include the entire premises and a subdivision of the property into two L-shaped lots, each having a frontage of 73 1/2 feet on Irving Avenue. The action was proper. The amendment was more restrictive than the application presented and of which all the property owners had notice. Neither the original Zoning Act nor the 1948 and 1949 amendments referred to above reveals any legislative attempt to circumscribe the discretionary power and duty of the board of adjustment by requiring it either to grant or deny the variance in the form applied for. As was said in the Home Builders Association case above (7 N.J. 335, at pages 341-342):
"To the contrary, the statute plainly authorizes a variance, so as to relieve against hardship, without substantial impairment to the public good or to the intent and purpose of the zone plan. The disposition of this question is a problem of statutory construction and not one of the general theory of zoning provisions. This is construed to vest in the board of adjustment the discretion to grant such relief as it may deem proper under all the circumstances of the matter before it."
A third contention is that the board of adjustment failed to make the jurisdictional findings required by the statute (R.S. 40:55-39(c), as amended), and it was error *56 for the trial court to consider and rely upon the supplemental findings made several months after the granting of the variance. Before a board of adjustment can act, it must find the necessary jurisdictional facts required by the statute. Brandon v. Montclair, 125 N.J.L. 367 (E. & A. 1940). As has already been pointed out, the minutes of the June 29 meeting of the board of adjustment, as they stood at the time when the village board of trustees met on July 2, contained no findings. They were subsequently amplified, apparently in an attempt to correct the deficiency. The enlarged record spoke of the area of the lot as a factor which "presented special conditions unique to this property alone, as distinguished from conditions affecting the whole neighborhood," and mentioned "exceptional and undue hardship placed upon the owners" in that "a number of property owners in the immediate vicinity can or have erected a dwelling on approximately 10,000 square feet." Assuming that these "findings" are supported by the facts, and ignoring the question of how and when the original minutes came to be enlarged, the board's decision was at this point still fatally defective. There was no determination, as required by the statute (R.S. 40:55-39, as amended), that the relief granted by the board was "without substantial detriment to the public good" and would not "substantially impair the intent and purpose of the zone plan and zoning ordinance."
The board did not pretend to pass upon the question of the public good and possible impairment of the zoning ordinance until October 8, 1951, some time after these cases were before the court. The board then met without further notice or hearing, and made findings "by way of supplement to and further specification of the Findings of the Board set forth in the minutes of its meetings of June 29, 1951, which Findings and Supplemental Findings are all based upon the evidence adduced before the board at its hearing held on said date."
These supplemental findings were relied upon by the trial court. They are quoted at length in the opinion and recognized *57 as a basis for the decision. The supplemental findings recite that the lot in question has unusually large frontage, area and depth for a single one-family dwelling; that almost all the other lots in the immediate vicinity have total areas of 10,000-15,000 square feet while the lot in question contains about 52,000 square feet; that other lots in the immediate vicinity have rectangular shape and approximate the minimal zoning requirements as to frontage and area; that division of 175 Irving Avenue into two lots for one-family dwellings will not affect the character of the neighborhood in any substantial manner or to any substantial degree; that each of these lots will still contain about 26,000 square feet, an area far in excess of other lots in the immediate vicinity, save one; that "the extraordinary conditions as found * * * are unique to this lot alone in the vicinity and the strict application of the zoning regulation in this instance would result in peculiar and exceptional and undue hardship upon any owner of this lot," and that division of the lot "will not be a substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."
The court below held that the board of adjustment had a right to make supplemental findings after the present actions were instituted, and this on the authority of Ackerman v. Board of Commissioners of Belleville, 1 N.J. Super. 69 (App. Div. 1948). That case held that a resolution of the board of adjustment, adopted after suit was started, could be considered by the court when the resolution declared that "at the time of its former action, [the board] had found certain facts which were the basis of its recommendation." The supplemental findings here merely state that they are based upon the evidence adduced by the board at its June 29 hearing. They do not state that at the time the board granted the variance it had actually found those facts required by the statute as a basis for its action.
However, the recitals and findings contained in the supplemental findings will be given the same effect as if they *58 were part of the board's original action, and this for two reasons. In the first place, the appellants at no time objected to the filing of supplemental findings or their use by the court below, either at the pretrial conference or thereafter. As a matter of fact, on December 7, 1951 they agreed to submit the consolidated cases for trial on the pleadings, the pretrial order and supplemental findings. Secondly, if there had been no findings to support the action of the board of adjustment, this court would have directed the board to set forth its findings or, at most, would have annulled the record without prejudice to further proceedings by the board, as was done in Brandon v. Montclair, 124 N.J.L. 135 (Sup. Ct. 1940), affirmed 125 N.J.L. 367 (E. & A. 1940). The supplemental findings do not, under the circumstances, impair any right of the appellants, and they enable the court to deal with the main issue directly and at once. Ackerman v. Board of Commissioners of Belleville, 1 N.J. Super. 69, 75 (App. Div. 1945).
However, the filing of supplemental findings by a board of adjustment months after it has granted a variance, and after the institution of an action challenging the grant, is to be condemned as a loose and undesirable practice. A board of adjustment is a quasi-judicial body, and as such it should act judicially. The findings required by the statute should be considered and determined before any action is taken upon an application for a variance. If a board of adjustment were permitted to file its findings after suit instituted, there would be nothing to prevent its molding them to meet the challenge of the complaint. Such a procedure would be in derogation of the statutory duty imposed upon boards of adjustment to make findings which have been described as a sine qua non to the proper exercise of the authority to grant a variance. Brandon v. Montclair, above, 124 N.J.L. 135, 145. "The rule that judicial findings must be made by quasi-judicial bodies, where the proofs support them, is a wholesome one." Ibid., 125 N.J.L. 367, 368.
*59 The fundamental question remains  was the action of the board of adjustment in granting the variance proper? R.S. 40:55-39(c), as amended, now provides:
"Where by reason of exceptional narrowness, shallowness or shape of a specific piece of property at the time of enactment of the regulation, or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any regulation enacted under the act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the owner of such property to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship." (Italics ours.)
The board of adjustment may grant a variance from the requirement of a zoning ordinance only where there are present factors peculiar to the property in question. A variance cannot legally be granted for reasons which also apply to other properties in the same neighborhood. A reading of section (c) of the statute shows that it is operative only where the applicant's plight is attributable to circumstances uniquely touching his own land as distinguished from conditions that affect the rest of the neighborhood. Ramsbotham v. Board of Public Works of Paterson, 2 N.J. 131, 135 (1949). The "extraordinary and exceptional situation or condition" must relate to his property, and to his alone.
"* * * the power of the board of adjustment to authorize a variance in the zoning regulations is limited to those cases in which the restrictions place hardship upon the owner of a particular piece of property because of a situation or condition peculiar to his property alone. The board of adjustment does not possess any legislative powers; its powers are only administrative. Therefore, when the situation, or condition, is general, and when it affects other properties within the same zone, in the same manner and to the same extent that it affects the lot, or plot of land in question, the board of adjustment does not possess the power to grant a variance. The proper remedy for relief in a matter of that nature lies with the governing body of the municipality to amend the zoning ordinance (R.S. 40:55-35; Brandon v. Montclair, 124 N.J.L. 135)." Lumund v. Board of Adjustment of Rutherford, 6 N.J. Super. 474, 480 (Law Div. 1949), affirmed 4 N.J. 577 (1950)."
*60 The authority of a board of adjustment to grant a variance under R.S. 40:55-39(c), as amended, is, as Justice Burling observed in the Lumund case, 4 N.J. 577, 584, in some respects more restricted by the amendment (L. 1948, c. 305) than it was prior thereto. He observed that the statute, as amended,
"does not obviate the showing that the plaintiff's land is uniquely affected but places an additional limitation upon the Board's authority to grant a variance, to wit, that it `may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and zoning ordinance.'"
After extended study the planning board of South Orange proposed the zoning pattern which was adopted by the village board of trustees in enacting the zoning ordinance of 1949. Appropriately, the area in which the property in question is located was zoned as a Residence A-100 District. That this area is of the highest residential character is patent from the record. The neighborhood is not one which has degenerated into an area of smaller homes crowded upon narrow lots. Zoning restrictions have been carefully maintained. Lots in the Montrose section must, as already noted, have a minimum street frontage of 100 feet and a 10,000-square-foot area. The Tzeses brothers have consistently sought a variance from the 100-foot requirement. The board of adjustment, fixing its attention upon the more than 51,000-square-foot area of 175 Irving Avenue, granted the variance which breaches the 100-foot provision and allows the applicants to divide the frontage into equal parts of 73 1/2 foot each. In this the board was in error.
There is no "exceptional narrowness, shallowness or shape," or "exceptional topographic conditions" to justify the variance here granted. Nor is there present some "other extraordinary and exceptional situation or condition" of the property which is peculiar to this lot alone and which would therefore result in "peculiar and exceptional practical difficulties *61 to, or exceptional and undue hardship upon the owner of such property * * *."
The block in which the Tzeses property is located is bounded by Irving Avenue on the south, Charlton Avenue on the east, Montrose Avenue on the north and Scotland Road on the west. Next door to the property are the Rush premises, fronting 140.75 feet on Irving Avenue and comprising 36,197 square feet. On Charlton Avenue there is a lot of about 110 feet frontage and almost 37,000 square feet area, and another with a 108-foot front and 22,662 square footage. On Montrose Avenue there are three lots, with frontages of 164, 175 and 112 feet, embracing areas of 41,000, 65,733 and 44,800 square feet respectively. (Mention may also be made of three other lots on this avenue, with 215, 200 and 200-foot fronts and 86,592, 92,088 and 100,000-square-foot area, respectively.) On Scotland Road there is a lot with a frontage of 175 feet and an area of 103,250 square feet. Diagonally across the way from 175 Irving Avenue is a lot of about 122-foot frontage and embracing 27,716 square feet. The recital of these figures demonstrates that foot frontage and area far above the minimum established by the zoning ordinance are not unique to the Tzeses lot alone. If the variance granted the Tzeses brothers is sustained, what is to prevent the Rushes, or the owners of the two lots on Charlton Avenue, or of the three lots on Montrose Avenue (with less than 200-foot frontages), or of the Scotland Road property, or the owner of the premises diagonally opposite the Tzeses property, from applying to the South Orange Board of Adjustment and urging that their properties, too, be split down the middle because of excessive square foot area?
The Tzeses' variance may well be the opening wedge to a destruction of the residential character of the entire Montrose section. Although only the lots in the block where the property in question is located have been commented upon, an inspection of the maps of the Montrose section shows that there are many other lots which lend themselves to subdivision at the instance of an enterprising developer. *62 The courts should not lend themselves to impairment of established residential areas, and thus undo the careful thinking that has gone into a zoning arrangement projected by a planning board and implemented by action of the governing body in passing the necessary zoning ordinance.
It is to be noted that in the very recent past a large lot close by the Tzeses property was subdivided. The subdivision was in strict conformance with the zoning requirements for Residence A-100 Districts. Bisecting this new development is Harrison Court, on either side of which there were laid out lots of more than 100-foot frontage and which embraces more than 10,000 square feet.
Counsel for the applicant points to a lot in the rear of the Tzeses property with only a 60-foot frontage on the private right-of-way that has been mentioned, and they also point to three lots with 90, 92 and 96-foot frontages on the south side of Irving Avenue opposite the Tzeses property. However, counsel frankly admits that their use for building lots cannot be questioned since they existed prior to the adoption of the zoning ordinance. The ordinance could not possibly operate upon these lots. The presence of so limited a number of lots with less than 100-foot frontage does not argue in favor of splitting the Tzeses lot into two 73 1/2-foot frontages.
Under the circumstances, neither the board of Adjustment nor the court can properly write out of the zoning ordinance a minimum frontage requirement merely because the property in question can be cut into halves and still meet the ordinance's minimum area requirement.
Two further observations are in order. The Tzeses brothers made no attempt whatsoever to claim that their lot is not usable for a single dwelling. Apparently their only motivation is that there is more profit in building two houses than one. The profit motive is not a proper consideration. It is not a sufficient reason for a variation that the proposed subdivision would be more profitable to the landowner. Ramsbotham v. Board of Public Works of Paterson, 2 N.J. 131 (1949).
*63 Further, in the present case it is clear that Tzeses Bros. walked into the situation with their eyes open. They made a contract to purchase the lot, conditioned upon getting a relaxation of the frontage requirement. They had unsuccessfully applied for a variance in January 1951. After all this, they nonetheless decided to take title without any reservation or condition, and did so on June 22, 1951, before the hearing on their second application for a variance. Prior knowledge of the provisions of the zoning ordinance and the need of securing a variance was noted in Home Builders Ass'n. of Northern New Jersey v. Borough of Paramus, 7 N.J. 335, 339 (1951). Although, as was said in Lumund v. Board of Adjustment of Rutherford, 4 N.J. 577, 581 (1951), a property purchase made with full knowledge of existing zoning restrictions is not conclusive in determining the existence of a hardship, such knowledge is a material element to be considered. And see Aschenbach v. Inhabitants of the City of Plainfield, 121 N.J.L. 598, 599 (Sup. Ct. 1939), affirmed on the opinion below, 123 N.J.L. 265 (E. & A. 1939).
The record establishes beyond question that the restrictions of the South Orange zoning ordinance did not work an exceptional or undue hardship upon the Tzeses brothers because of any extraordinary and exceptional situation or condition peculiar to their property alone. It further establishes that the variance granted by the board of adjustment is not without substantial detriment to the public good and will substantially impair the intent and purpose of the zoning plan and zoning ordinance.
Accordingly, the judgment below is reversed insofar as it approved and confirmed the grant of a variance by the board of adjustment and directed the building inspector to issue a permit under and in accordance with the determination of the board. The judgment is affirmed as to the setting aside of the resolution of the Board of Trustees of the Village of South Orange.