IRVING ISKO, GEORGE FUCHS, LEONARD WOLFE, MOR-
TON SCHWARTZ, RICHARD SLUTZKER, SAMUEL RAT-
NER, SHELDON HORING, THEODORE SCHATZBERG
AND LLOYD JANOW, PLAINTIFFS-APPELLANTS, v.
PLANNING BOARD OF THE TOWNSHIP OF LIVING-
STON, BOARD OF ADJUSTMENT OF THE TOWNSHIP
OF LIVINGSTON AND THE TOWNSHIP OF LIVING-
STON, A MUNICIPAL CORPORATION, AND ST. BARNA-
BAS MEDICAL CENTER, DEFENDANTS-RESPONDENTS.

Argued December 5, 1967—Decided February 5, 1968.

Mr. *David Schechner* argued the cause for appellants (*Messrs. Schechner and Targan,* attorneys).

Mr. *Louis Sherman* argued the cause for respondent Board of Adjustment of the Township of Livingston (*Messrs. Raff, Sherman & Scheider,* attorneys).

Mr. *Charles Danzig* argued the cause for respondent St. Barnabas Medical Center (*Mr. Benjamin P. Michel* on the brief; *Messrs. Riker, Danzig, Scherer & Brown,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. The Board of Adjustment of the Township of Livingston granted what it designated a variance from the building height restrictions of the township zoning ordinance to permit St. Barnabas Medical Center to construct a wing to be added to its existing main hospital building located on Old Short Hills Road. The Planning Board thereafter approved the site plan as required by the ordinance. Plaintiffs, residents and owners of nearby property, after unsuccessfully opposing the Center's application before the Boards, instituted this action in lieu of prerogative writ in the Superior Court, Law Division, to attack the grant. The Law Division affirmed the action of the Board of Adjustment, holding that it was authorized by the general zoning statute *N. J. S. A.* 40:55–39 (*c*). Plaintiffs appealed and we granted certification before the matter was argued in the Appellate Division.

Although the trial court affirmed the action of the Board of Adjustment in authorizing a permit for the new construction, it reversed the Planning Board approval of the site plan because of alleged procedural due process de-

ficiencies. That aspect of the case was remanded for rehearing in accordance with directions set forth in the opinion. Jurisdiction thereof was retained by the trial court pending disposition by the Planning Board. Without waiting for the rehearing there, plaintiffs took the present appeal from the part of the judgment which affirmed the so-called variance. This should not have been done. The appeal should have awaited Planning Board action on the remand, and review thereof by the Law Division. In that manner, a complete and final judgment on all issues would have been presented to us for decision. Other procedural questions have been raised also, particularly whether plaintiffs' Law Division suit was instituted within the time prescribed by our rule, R. R. 4:88–15(b)(3). In view of the public nature of the case, we have decided to put aside all such problems and to dispose of the basic question on the merits.

In the late 1950's, after nearly a century of hospital operation in Newark, N. J., St. Barnabas decided to establish a modern medical center elsewhere. A large tract was needed because its intention was to design and construct such a center in accordance with modern standards and technology for hospital administration and diagnosis, medical and surgical treatment, and care of patients. It is obvious from the record that the plan envisioned main and appurtenant hospital buildings, accessory outbuildings, large parking facilities, and adequate buffer zones between the hospital complex and the streets and the surrounding land areas. In 1958 a 65-acre site was located and acquired on Old Short Hills Road in Livingston, N. J. At the time of acquisition, a number of muncipalities in the westerly portion of Essex County, i. e., West Orange, South Orange, Maplewood, Millburn (Short Hills), Verona, Essex Fells, Roseland, The Caldwells, Fairfield, Cedar Grove and Livingston, were without general hospital facilities. Their total population in 1950 was 128,949. The 1960 census showed an increase of about 35% to 173,899, and it is a matter of common knowledge that the substantial growth has con-

tinued since that census. There can be no doubt as to the public utility of a hospital center in the locality.

When the tract was purchased it was located in a district designated Residence AA by the Livingston zoning ordinance. A hospital (other than one for contagious or mental diseases) was a permitted use in the district at the authorization of the Board of Adjustment, subject to such conditions as the Board might impose. (This is really a special exception of the type authorized by *N. J. S. A.* 40:55–39(*b*)). These conditions related to the general character and height of the structure, surrounding open spaces, street capacity, and "the preservation of the general character and well being of the neighborhood * * *." St. Barnabas made an application for a hospital complex to the Board of Adjustment and on April 17, 1958 it was unanimously approved and the Building Inspector was directed to issue a permit "for the development and construction of a Medical Center" on the site, subject to certain conditions. The conditions related to distances of any buildings to be erected from the front, side and rear lines of the property, and the maintenance "of a natural buffer consisting of the trees and other growth presently existing on the hospital tract to a depth of at least 100 feet along the westerly or Ross Road property line of the tract, and to a depth of 75 feet along the northwesterly and northeasterly property lines of the tract."

No specific limitations were placed on the number of buildings to be constructed. Certain height restrictions were imposed, however, which are of significance and must be noted.

With respect to height of buildings in the residence zone, the ordinance provided:

"Dwellings shall not exceed 2½ stories or 35 feet in height. There shall be *no limitation* upon the height of non-residential structures, except that for each foot the height of a building exceeds 35 feet the total width of the two side yards shall be increased by 2 feet." (Emphasis added.)

Undoubtedly on the basis of that provision, the Board added a height condition to its approval of the proposed construction:

"The main hospital building or any appurtenance thereto shall not exceed a maximum height of 105 feet from ground level."

No one suggests that either the original main hospital building or the proposed new wing has violated or will violate the side yard requirement or the 105-feet height limitation. Another factor must be noted also. Obviously when the authorization to build the Center was granted, the Board had two types of structures in mind and differentiated between them. One type was the main hospital building and "any appurtenance thereto"; the other type was described as "any outbuilding." The former was allowed a height of 105 feet; but as to the latter the permit said "any outbuilding to be constructed and used in conjunction with the medical center shall not exceed a height of 35 feet or 2½ stories, whichever shall be the lesser." The authorization was prospective in scope and undoubtedly contemplated issuance of specific permits by the Building Inspector for the various projects as the Center developed. When the authorization was given, none of the plaintiffs' homes had been built.

Shortly after the Board's 1958 general grant, the Building Inspector issued a permit and construction began on the main 600-bed hospital building. As one would expect, this building, together with the planning and development of the grounds, accessory roads, power plant, parking lots, etc., was a large undertaking and involved a considerable period of time. This phase of the project was completed in July 1965 at a cost of about $16,000,000, although the Center had begun actual operations in November 1964. Nobody has ever claimed, as far as the record reveals, that there was any undue delay in this phase of the construction work, or that when it was finished the Medical Center was complete and no further structures, buildings or additions were contemplated.

It should be mentioned at this point that on July 20, 1959, about 15 months after the Board of Adjustment grant of permission to construct the Medical Center, the Township adopted a revised zoning ordinance. Under the revision, hospitals continued to be permitted uses in the residence districts, subject, as formerly, to approval of the site plan by the Planning Board. The provision of the earlier ordinance, which specifically excluded any height limitations on non-residential structures, such as hospital buildings, was eliminated. The new section, which is still in force, says:

"No building shall exceed a maximum of two and one-half stories or 35 feet in height, whichever is the lesser."

The record shows that as far back as 1962, St. Barnabas contemplated hyperbaric chambers for the hospital and made public statements with respect to such an additional facility. Its president testified that long before the main hospital building was completed, the design and location of the structure to house the chambers had been considered. The appendix contains a site plan prepared by a firm of architects and issued on June 24, 1965, showing the proposed six-story "Hyperbaric Wing" and its location with respect to the main building. It appears also that in early October 1965 an architect representing the firm which had been acting for the Center presented to the Director of the Livingston Department of Planning and to the Building Inspector plans and specifications for a six-story structure, one wall of which would be the existing north wall of the main building. The first two floors were designed to house the hyperbaric chambers, and the upper four floors were to provide an additional 150 beds. This presentation was made because it was the view of the Center officers that the proposed addition (variously called an annex, an appurtenance, an addition or an extension of the existing main hospital building) was included within the 1958 Board of Adjustment grant of permission to construct the main hospital building or any appurtenance thereto up to a maximum

height of 105 feet. It seems plain that at an informal conference the Center's architect learned that the Building Inspector held a contrary view as to the scope of the 1958 permission. He discovered that the two-story portion of the building to house the hyperbaric chambers would probably receive immediate approval from the Planning Board because it would be less than 35 feet in height as prescribed by the 1959 ordinance. On the other hand, as to the six-story structure, the Building Inspector's opinion was that since it exceeded the 35-feet-height limitation, a variance would have to be obtained from the Board of Adjustment before a permit could be issued properly. That objection was the only one raised. Concededly the hospital use was a permitted one under the ordinance.

The testimony reveals that certain hyperbaric tanks were scheduled for delivery to the hospital site in the near future. Consequently, a decision was reached to apply to the Planning Board at once for site plan approval and thereafter for a building permit for the two-story part of the proposed six-story building. This was done and Planning Board approval was given on October 19, 1965. Three days later the building permit was issued and construction began in November 1965. The work was completed in October 1966 at a cost, exclusive of equipment, of about $1,000,000.

Four months after issuance of the permit for the two-story hyperbaric chambers wing, the Center formally applied for leave to build the additional four stories above that wing to house 150 more beds for use substantially in connection with the hyperbaric facility. The form of petition provided by the Board of Adjustment was headed "General Variance" and was entitled "Petition to Deviate from Requirements of Zoning Ordinance." According to the Center's attorney, it was the only form provided and, therefore, it was completed although he felt that by virtue of the 1958 grant, a permit to build should not be subject to the 35-feet height restriction. The petition sought a variance from the requirement of section 903(a) of the zoning ordinance (the

35-feet height limitation) in order to permit the Center to build a hyperbaric wing to be attached to the existing hospital. It noted, however, that the "original variance authorized hospital and appurtenances to [a] height of 105 feet."

In describing the relief sought, the petition noted that the height of the authorized two-story addition (then under construction) was 28 feet 9 inches and that the complete structure sought to be built was 82 feet. Since 35 feet in height was permissible, a variance for the additional 47 feet was requested. Two public hearings were held thereon. A number of witnesses were heard for and against the application, after which decision was reserved.

The testimony disclosed that the height of the main hospital building is 95 feet 9½ inches. The overall height of the building for which the variance was sought did not exceed that of the main building. It was to be somewhat under 91 feet, i. e., 28 feet 9 inches for the authorized two stories, and 62+ feet additional for the four stories to be superimposed thereon. As has been noted, the north wall of the hospital and the south wall of the new building is to be a common wall. The remaining three walls are to be of the same type of construction and appearance as the existing hospital building. It seems perfectly clear that on completion the six-story addition will be fully integrated with the main building and the two structures will look like one. The four additional floors will not encompass the full perimeter of the two-story hyperbaric chambers building. A small part of the westerly side of the latter will remain two stories. On each floor the corridors of the main hospital will be continued through its north walls into the new building (although it is not clear that this will be true of the sixth floor). A person on the inside will pass along the corridors as if it were all one building.

On May 19, 1966, the Board of Adjustment made elaborate findings of fact supporting the grant of the variance. In view of the determination we have reached in the case,

it is not necessary to set out their findings in detail. It may be useful, however, to mention two of them:

"3. That the applicant appears before this Board solely for the purpose of requesting a variance with respect to the height of the proposed combination hyperbaric-oxygenization chamber and concentrated patient care facility, which will be constructed at the end of one of the present wings of St. Barnabas Hospital, and when constructed will appear to be an extension of same, including side walls and height and will be within the set-back limitations as previously designated by the Board in connection with its original approval of construction of the hospital facility.

4. That the construction and use of the combination hyperbaric oxygenization chamber and concentrated patient care facility, as proposed by the applicant, will promote the general health and welfare of the citizens of Livingston, as well as the citizens of the neighboring communities."

After concluding also that the height variance could be granted without substantial determent to the public good and without substantially impairing "the intent and purpose of the zone plan and zoning ordinance," it granted the variance conditioned upon the Center making further application to the Planning Board, as required by the zoning ordinance, for approval of the site plan. In that connection it said that if the Planning Board did not approve the site plan, then the grant of the "height variance" would be void.

The required further application was made. After holding hearings and making findings of fact, the Planning Board approved the site plan on September 15, 1966. It found, among other things:

"2. The proposed addition is not an expansion of the hyperbaric-oxygenization chamber, but the addition of a new 150 bed wing to the Medical Center for concentrated patient care—a twenty-five percent expansion in the bed capacity of the center.

3. The site plan, as submitted, is consistent with the conditions and limitations set forth by the original Zoning Board of Adjustment decision dated April 17, 1958 and the plot plan attached thereto and known as Exhibit A, which is dated April 1, 1958."

After some further proceedings before the Planning Board, which need not be mentioned here, on October 27,

1966 plaintiffs instituted the present suit in lieu of prerogative writ to invalidate the action of both the Board of Adjustment and Planning Board.

At the hearing in the Law Division, the defendant-Center contended that the Board of Adjustment properly authorized the Building Inspector to issue the building permit (subject to Planning Board approval of the site plan) either by virtue of *N. J. S. A.* 40:55-39(*a*), because the Center was entitled to the permit as a matter of right as a result of the 1958 Board of Adjustment approval of the construction of a main hospital building and any appurtenance not to exceed 105 feet in height, or, alternatively, if a variance was needed, it was properly granted under subsection (*c*) of *N. J. S. A.* 40:55-39. The trial court rejected the Center's first claim, but ruled that the variance was properly granted under subsection (*c*) of the statute.

For purposes of perspective, pertinent parts of the relevant statute should be noted:

"The board of adjustment shall have the power to:
a. Hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative official or agency based on or made in the enforcement of the zoning ordinance." *N. J. S. A.* 40:55-39(*a*).

The board is given further power to authorize a variance, when the proposed structure or use is a permitted use,

"c. Where by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or by reason of exceptional topographic conditions, or by reason of other extraordinary and exceptional situation or condition of such piece of property, the strict application of any * * * [zoning ordinance] enacted under the act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the owner of such property * * * *provided, however,* that no variance shall be granted under this paragraph to allow a structure or use in a district restricted against such structure or use." *N. J. S. A.* 40:55-39(*c*).

Subsection (*d*) of the same section gives power to a board of adjustment to

"Recommend in particular cases and for special reasons *to the governing body* of the municipality the granting of a variance to allow a structure or use in a district restricted against such structure or use. Whereupon the governing body or board of public works may, by resolution, approve or disapprove such recommendation. * * *" (Emphasis added.)

The form of petition provided by the Board of Adjustment and filed by the Center simply specified that a height variance was sought. No requirement was imposed that the nature of the variance applied for be stated in terms of either *N. J. S. A.* 40:55–39(*c*) or (*d*). There can be no doubt that the Board could have recommended a (*d*) variance to the governing body, if in its judgment the facts warranted such a recommendation. It did not *recommend* a variance, however; it *granted* a height variance, subject to site plan approval by the Planning Board. In doing so, no reference was made to subsections (*c*) or (*d*) of the statute. On the record as presented to the trial court, the variance could not be dealt with as a (*d*) type because the Board of Adjustment did not make the required statutory recommendation; nor was any such recommendation considered and approved by the governing body. Moreover, no application was made to the trial court to remand the matter to the Board of Adjustment to permit it to recast its action in the form of a recommendation for a variance, and then to present the recommendation to the governing body for approval.

██ As noted above, the trial court rejected the Center's claim that the adjustment board's action was proper under *N. J. S. A.* 40:55–39(*a*), but concluded that the variance was valid under subsection (*c*). We hold the view, however, that defendant was entitled to a building permit for reasons to be stated hereafter, and that in the exercise of its authority under *N. J. S. A.* 40:55–39(*a*) the Board should have overruled the Building Inspector's declaration that a variance was necessary. Further, we cannot agree

that the facts warranted a variance under subsection (c) of *N. J. S. A.* 40:55–39.

■ There is no showing in the record of any exceptional narrowness, shallowness, or shape of the hospital tract, or exceptional topographic condition of the land or any other extraordinary physical condition thereof which would cause undue hardship if the height restriction of the zoning ordinance were enforced. Only recently this Court declared that hardship personal to the owner which is unrelated to the physical characteristics of the land is not contemplated by subsection (c) and does not constitute sufficient ground for the granting of a variance under that subsection. *Place v. Board of Adjust. of Borough of Saddle River,* 42 *N. J.* 324, pp 331–332 (1964). See *Ward v. Scott,* 11 *N. J.* 117, 133 (1952); *Bern v. Borough of Fair Lawn,* 65 *N. J. Super.* 435, 448 (*App. Div.* 1961); *Tzeses v. Board of Trustees of Village of South Orange,* 22 *N. J. Super.* 45 (*App. Div.* 1952). There is nothing in this property which is unique to it, differentiating it physically from other property in the zone, and as a result of which unnecessary and exceptional hardship will be visited upon its owner if the building height limitation is applied. It's topography is no different from other land in the district, and therefore subsection (c) provides no basis for a variance.

■ The situation under subsection (d), however, is different. It authorizes the board to recommend that the governing body grant a variance for "special reasons" if certain criteria are met. The elaborate findings by the Board, to which we have already alluded, amply disclose qualifying special reasons and satisfy all of the negative criteria specified by the statute. Under the circumstances, such a recommendation could properly have been made to the governing body. *Cf. Kunzler v. Hoffman,* 48 *N. J.* 277 (1966); *Andrews v. Board of Adjustment of Ocean Twp.,* 30 *N. J.* 245 (1959); *Grundlehner v. Dangler,* 29 *N. J.* 256 (1959). If it were necessary, the record could be remanded to permit the board to change the grant of the variance (subject to

the conditions imposed) to a recommendation to the governing body that it be granted, and then to submit the matter to the governing body for approval or rejection. But we do not consider such a remand necessary. It is a commonplace of appellate review that if the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance. *Marchitto v. Central R. Co. of N. J.*, 9 *N. J.* 456 (1952); *Ballurio v. Castellini*, 29 *N. J. Super.* 383 (*App. Div.* 1954); *Volker v. Connecticut Fire Ins. Co.*, 22 *N. J. Super.* 314 (*App. Div.* 1952). Application of that doctrine, if appropriate, is particularly vital here. The local authorities have found that the public interest and welfare, as well as the private interests of the Center, will be served by the proposed additional construction. The matter has been pending since October 1965 and should not be delayed further if in justice a building permit should be granted on the existing record.

As will appear presently, the Building Inspector was in error in requiring the Center to obtain a height variance from the Board of Adjustment, in addition to site plan approval from the Planning Board, before he would issue a permit. As we view the unique provisions of the zoning ordinance and their relation to this unusual case, the only condition to which the construction of the four-story addition was subject was Planning Board approval of the site plan. In our judgment the height limitation section of the ordinance was not applicable.

Upon enactment of the 1959 ordinance with its height limitation of 35 feet, the main hospital building became a valid non-conforming structure because of its height of 95 feet 9½ inches. In connection with non-conforming buildings, section 501 of the ordinance provided

"Any lawful non-conforming use which existed at the time of the adoption of this ordinance may be continued and any existing building designed, arranged, intended or devoted to a non-conforming use may be reconstructed or structurally altered, subject to the following regulations:

(a) The *total* structural alterations made in any such building shall in no case exceed 50 percent of the value of the building at the time of the adoption of this ordinance, nor shall the building be enlarged, unless the use therein is changed to a conforming use; *provided, however, that where a building meets the use requirements of this ordinance but is non-conforming because of height and area regulations, structural alterations made in any such building may exceed 50 percent of the value providing the height and area requirements are not further violated.*" (Emphasis added)

In light of this provision, if the Planning Board approved the site plan, the Center was entitled to a building permit, without a variance, providing the four-story structure, whether described as a wing, addition, annex, or appurtenance to the main hospital building, constituted a structural *alteration* and did not further violate the height and area requirements.

Alteration of a building is defined in section 303 of the ordinance as

"Any change in the supporting members of a building; *any addition to* or diminution of *a building;* a change in use from that permitted in one zone district to a use permitted in another; any conversion of a building, or a part thereof, or the removal of a building from one location to another." (Emphasis added)

The two-story hyperbaric chambers structure has been completed. It is part of and thoroughly integrated with the main hospital building. Obviously it was an "addition" to that building. The four stories to be built on top of the hyperbaric chambers similarly are an addition to and fully integrated with the main building. The end result will be one building. However, the new four-story portion is described, clearly it is an "addition" and therefore its construction constitutes an "alteration" of the hospital building. Moreover, in terms of the original grant of 1958, it qualifies also as an appurtenance.

The remaining question is whether the height limitation of the ordinance will be "further violated" by the six-story addition to the hospital. The significance of the proviso is somewhat ambiguous. Clearly the full paragraph, 501(a),

authorizes unlimited structural additions to a conforming-use building which is non-conforming as to height. The only qualification is that the height *and* area requirements cannot be "further" violated by the new construction. The present hospital is 95 feet 9½ inches high, more than 9 feet less than the originally authorized height of 105 feet. With respect to area, the 1958 ordinance allowed unlimited height, provided the lot was large enough to permit the total width of the two side yards to be increased by two feet for every one foot of height of the building above 35 feet. The original hospital building met the side yard requirement. The new six-story structure, about 91 feet high, also meets the 1958 requirement and all area demands of the ordinance now in force. Moreover, it is an enlargement of the original building, a physically integrated part thereof which does not exceed its parent building in height. Consequently, in light of the 1958 ordinance, the locally known history of the Medical Center, the unusual provision of section 501 of the ordinance respecting alterations of a conforming-use building of non-conforming height, and the fact that the height of the addition will not exceed that of the existing non-conforming building, in our opinion it is fairly within the sense of the proviso to hold that the height requirements will not be "further" violated. As we have indicated, the significance of the proviso is not as clear as it might be. It seems to us, however, in view of the unusual circumstances present here, that the interpretation adopted is a just and reasonable one. It is highly unlikely that a situation like this one will arise again. In any event, for purposes of future administration of the zoning ordinance, the local authorities might well give consideration to revision of section 501 so that its intendment will be beyond question.

Our conclusion that construction of the additional four stories on the connected hyperbaric wing of the hospital is within the scope of section 501(a) of the zoning ordinance means that a height variance was unnecessary. It signi-

fies also that the Building Inspector erred in requiring such a variance in addition to site plan approval by the Planning Board. Finally it follows that the Board of Adjustment, on review of the Building Inspector's decision, would have been justified under *N. J. S. A.* 40:55–39(*a*) in authorizing a building permit subject to site plan approval. That being so, it is immaterial that the corrective action was couched unnecessarily in terms of a variance. Its remedial order simply corrected the error and brought about a result the Center was entitled to have without an application for a variance.

What we have said in sustaining the action of the Board of Adjustment applies with equal force to the Law Division. As noted above, its affirmance of the Board was put erroneously upon the ground that *N. J. S. A.* 40:55–39(*c*) justified grant of the variance. Since the Center was entitled to the building permit (subject to site plan approval), the court's judgment must be sustained, but for the reasons we have expressed.

In view of the substantial lapse of time already involved in these proceedings, and the public and private interests involved, the matter should be disposed of expeditiously, both by the Planning Board and the Law Division. In this connection, attention is called to the fact that on the application before the Planning Board the issue of alleged height violation of the four-story addition is not open for consideration. Our determination on that score is dispositive, and the building permit must be granted after site plan approval, which will depend upon the usual factors involved, exclusive of alleged height violations.

Accordingly, the judgment is affirmed as modified. The record is remanded for further proceedings not inconsistent herewith.

*For affirmance* — Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, GOLDMANN and SCHETTINO—5.

*For reversal*—None.