47 N.J. Super. 306 (1957)
135 A.2d 682
NEWARK MILK AND CREAM COMPANY OF NEWARK, NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
TOWNSHIP OF PARSIPPANY-TROY HILLS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; EDWARD V. MANNING, MAYOR, AND GEORGE A. WEST, LOUIS M. FRAYLER, F. EARL WALTER, JR., AND CLIFFORD E. HERMEY, COUNCILMEN, CONSTITUTING THE TOWNSHIP COUNCIL OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS; RICHARD CHERKIN, ACTING TOWNSHIP MANAGER OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS; AND DOROTHY W. COOK, CLERK OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 22, 1957.
*309 Messrs. Riker, Emery & Danzig (Mr. Everett M. Scherer appearing), attorneys for plaintiff.
Messrs. Jeffers, Mountain & Franklin (Mr. Benjamin Franklin, III, appearing), attorneys for the defendants.
HALL, J.S.C. (orally).
This is an action in lieu of prerogative writ brought by the plaintiff landowner to set aside as unconstitutional and void an amendment to the township zoning ordinance adopted April 10, 1956, placing the plaintiff's property in a Class III Specialized Economic Development District thereby created and providing regulations and procedures concerning the use thereof, and to restrain the defendant township officials from taking any action pursuant to the amendment.
*310 The amendment in question added to the original ordinance section 73.14(b), which created a zone classification called "Specialized Economic Development Districts" and provided for three classes of such districts  I, II and III. Another part of the amendment added to section 73.25 of the original ordinance a subsection which delineated by metes and bounds the areas comprising the districts, there being one Class I District, two Class II Districts and one Class III District, which latter comprises about 440 acres and consisted only of the plaintiff's property. Since the amendment was adopted another area has been designated as a Class III District as well.
Section 73.14(b) first specifies the intent or purpose of these special districts in this language:
"* * * it is the intent to permit and encourage, in areas exhibiting a peculiar suitability therefor the establishment of a class of uses that will
1. Conserve the value of property;
2. Achieve optimum utilization of areas devoted to these uses by the substantial exclusion therefrom of such incongruous uses as residential, retail business, commercial, and the like;
3. Provide primary employment for the labor supply that is resident in the township and vicinity;
4. Yield a fair and reasonable share of municipal revenue, which is essential to provide adequate and efficient public facilities and governmental services that are required for the most beneficial use of land in the township and for the purpose of encouraging the most appropriate use of land throughout the township; such uses to be located in districts established in accordance with a comprehensive plan of land use that reflects the objectives of Part I of the Master Plan of the township and to be so conducted that there will be
(a) A harmonious relationship between such uses and uses in adjacent districts especially those that are residential or commercial in character;
(b) No detrimental effect of any such uses on other uses in the district;
(c) A satisfactory relation between the operation of such uses and access thereto with existing and prospective roads and highways of the township as set forth in Part II of the Master Plan of the township."
There then follows a little later on the uses permitted in the district in this language:
*311 "The uses hereafter established in such districts shall be confined except as hereinafter set forth to the following, including combinations thereof, at an intensity not to exceed the limitations imposed by the performance standards hereinafter set forth in this section:
1. Offices for executive or administrative purposes;
2. Scientific or research laboratories, including incidental pilot plants in connection therewith;
3. Fabrication and assembly of products;
4. Processing of materials;
5. Agricultural uses."
The amendment then specifically prohibits certain uses, including all residential uses, with minor exceptions related to the other uses of the property, and all retail business uses except those immediately incidental and appurtenant to a use permitted on a lot.
The permitted uses are further delineated as to their general nature of activity by prescribed performance standards then set forth in the amendment, which deal primarily with the principle that no use shall be established, maintained, or conducted so that the same will cause any dissemination of smoke, fumes, gas, dust, odor, noise and so forth, perceptible beyond the boundaries of the site; will discharge any waste material in any water course; create traffic on any street primarily serving residential districts that is incongruous with the traffic normal to such street; and create physical hazard by reason of fire, explosion, radiation, or similar cause, to property in the same or adjacent district.
The effect of these permitted and prohibitive uses is very definitely to limit the use of any property within one of these Specialized Economic Districts.
It should be noted, I think, that the term "lot" which is used throughout this amendment is defined as a duly approved subdivision or a leased parcel of land or a leased building.
The provisions of the section dealing with intensity of use are of importance. There are specific requirements with respect to each of the three classes as to minimum lot size; street frontage; yard dimensions, front, side, and rear; *312 maximum coverage of lot by all buildings, and maximum building height.
The differences in these requirements represent the only distinctions between the different classes of the district.
Except for minimum lot size and minimum street frontage, the differentiation in these requirements is in two groups, one applying to Classes I and II, and the other applying to Class III, with very minor variation.
The minimum lot size is three acres in Class I, five acres in Class II, ten acres in Class III, and the minimum street frontage in the same respective order is 200 feet, 300 feet, and 400 feet. Maximum coverage of the lot by buildings is 30% in the case of Class I and 20% in the case of Class II and III.
The amendment then goes on to specify other requirements to which any use must conform.
First, there must be an adequate belt of landscaping along the line of any lot contiguous to any residential district, regardless of any intervening street or highway, together with such fences or walls as may be required to provide appropriate screening of the operations on such lot from within such residential district. This applies only where a lot is contiguous to a residential district.
The second requirement is that the storage of all materials and equipment shall be in enclosed buildings, or otherwise appropriately screened by such walls, fencing and landscaping as may be required to screen such materials and equipment from outside the lot boundaries. This requirement applies whether or not the lot is contiguous to a residential district.
Thirdly, there must be adequate parking space for employees and visitors and loading space on each lot, based on the nature of the establishment and operations thereof.
Fourth, there is a limitation on signs to those necessary for directional and safety purposes and to identify the use, the latter to be designed as a part of an architectural design of the building or site plan.
*313 Finally, building plans must be prepared by a New Jersey licensed architect or engineer.
Then there follows another subsection of the amendment which is of immediate importance in this case, entitled "Site Plan Approval," which specifies that no building shall be erected and no sanitary permit shall be issued in connection with any use in any of these districts unless a site plan for the lot shall be approved by the planning board. It provides that in acting on any site plan the planning board shall pass on:
"1. the layout of the site with respect to the arrangement and widths of driveways on the site and giving access thereto;
2. the amount of space required for automobile parking and for the loading and unloading of goods and materials, the location of such space, and access thereto;
3. the improvement of roadways, automobile parking areas, and loading and unloading areas, by grading, surfacing, and the installation of drainage structures; and the installation of water lines and facilities for sanitary sewerage; all to such extent and in such manner as the Planning Board may deem to be required by the circumstances of the particular case; provided, however, that final approval of the Planning Board shall not be given until water supply, drainage, sanitary and waste disposal facilities shall be approved by the Board of Health;
4. the display of signs;
5. the appropriateness of the site plan and of the design of the buildings in relation to the physical characteristics of the site, the character of the neighborhood, and the most beneficial prospective use of land in the neighborhood."
The planning board may further be brought into the picture if the building inspector is in doubt, on any application for a building permit or certificate of occupancy, as to whether or not the proposed use will reasonably conform to the performance standards and the previously approved site plan, in which case he shall refer the matter to the planning board "which shall make a determination of the case."
It is further provided that the certificate of occupancy, once issued, may be revoked by the building inspector, or he may otherwise enforce the provisions in the event of *314 failure to comply with any of the conditions of the site plan approval or of the certificate of occupancy.
Other procedural sections of the amendment provide for applications to be made to the building inspector for the building permit and the certificate of occupancy, and it is upon him that the duty of enforcement is imposed.
By way of summary, the whole scheme for the proposed uses in one of these Specialized Economic Development Districts seems to call for:
1. An application for a building permit or certificate of occupancy to the building inspector, with a determination by the building inspector that the proposed use is within those permitted and that the proposed operation will conform to the performance standards, with the right in building inspector to refer the latter question to the planning board for determination.
2. Site plan approval by the planning board, before any permit can be issued by the building inspector, including
(a) the extent, layout, location, grading, surfacing and drainage of interior and access driveways, parking and loading yards;
(b) the extent of landscaping and screening where appropriate;
(c) the extent and manner of installation of water lines and sanitary sewage facilities;
(d) the display of signs; and
(e) the appropriateness of site plan and design of buildings in relation to the site itself and the neighborhood, present and future, after a report from the township engineer and any other municipal officials with respect to the effect on existing municipal services and utilities, and a possible contract between the township council and the applicant regarding the development of necessary municipal facilities.
Obviously the scheme calls for individual consideration and approval of each proposed use, with a very considerable amount of discretion given to the planning board and, to some extent, to the building inspector. There is no express *315 provision in the ordinance for the mechanics of procedure by the planning board in passing upon all matters committed to it, or for any administrative appeal from its determination.
The plaintiff's attack on the amendment is three-pronged:
1. It is unconstitutional, both generally and particularly, with respect to the premises in question, in creating a district from which so-called higher uses are excluded, which was not adopted for any of the statutory purposes of zoning, and which is in disregard of the needs of the community, the suitability of plaintiff's land for particular uses and the conservation of the value of its property.
2. It is illegal, arbitrary and discriminatory with respect to the plaintiff's property in imposing different regulations between the three classes of Specialized Economic Development Districts, as well as to the regulations which are unreasonable in themselves.
3. It is invalid in delegating power to the planning board, especially with respect to the site plan approval requirements; and even if the delegation is valid, there are insufficient standards to guide the board.
The defendant, while conceding the advanced and somewhat novel features of the amendment, takes the position that the exclusionary use provisions, as well as the inclusion of plaintiff's property within the district, are entirely reasonable and within the statutory power as part of a comprehensive plan for promoting the general welfare and encouraging the most appropriate use of land throughout the municipality, on the theory that it is a legitimate purpose of zoning to bring about balanced land use and development in the township and a resultant sound and balanced municipal economy. The emphasis is on the use of zoning as a dynamic implement of planning for the present and the ultimate good of the municipality as a whole. The defendants also contend that the regulations themselves are reasonable, that the difference in regulation between the various classes of the district is reasonable and proper, and that the delegation to the planning board is valid and accompanied by adequate standards.
*316 It should be noted that there is no charge or evidence of any bad faith on the part of the municipality, or any discrimination against plaintiff's land for any nefarious or ulterior purpose. I think it can be taken as conceded that the legislative action of the municipality under attack was entirely on a high plane and purpose, and taken with the aid of competent professional consultants and after thorough study and consideration. The evidence presented to the court, especially the expert testimony on both sides, was of exceptionally high quality. There is no evidence that this amendment was adopted in order to block or hinder some projected change of use by plaintiff permitted by the ordinance before the amendment.
The facts within the framework of which this controversy must be considered were fully presented by extensive testimony and exhibits. In addition I have also inspected not only the plaintiff's property but also practically the entire township in order that I might better understand the evidence.
As has been indicated, the Class III Specialized Economic Development District in question involves only property of the plaintiff and comprises about 440 acres. This is not all of plaintiff's property in the area. The district is bounded on the south by State Highway Route 10, the frontage there being about 3,870 feet; on the west by Littleton Road, which is present U.S. Route 202 soon to be relocated, with a frontage thereon of about 4,300 feet; on the north by a small strip of Halsey Road and a proposed new road extending approximately one mile easterly to about the township boundary line with Hanover Township; and on the east by the Hanover Township line extending southerly a distance of about 3,500 feet. Plaintiff's other lands in the area comprise the extension of the 440-acre tract into Hanover Township along the northerly side of Route 10, consisting of 50 or 60 more acres; another 70 or 80 acres on the south side of Route 10 and opposite the main tract, partly in Parsippany-Troy Hills and partly in Hanover; more acreage on the opposite or west side of *317 Littleton Road without frontage on Route 10, and also some additional land north of the proposed new road and approaching the Lake Parsippany development.
The plaintiff has owned these lands since 1937 and operates thereon a large dairy farm and milk business with grazing lands, growth of crops for stock consumption, necessary barns, outbuildings and the like. Besides a few houses for employees there is a large mansion house on the property setting back from the east side of Littleton Road, which is rented to the township for a public school and school offices. Another sizeable house in the same general location is rented for a nursery school. At the northeast corner of Route 10 and Littleton Road the plaintiff operates, and has for many years, a retail commercial business known as the Alderney Milk Barn, which is a restaurant and dairy bar, attractive in appearance.
Prior to the zoning amendment in question the area within the new district was zoned by the ordinance, first adopted in 1945, as Class A Residential. The dairy barn business is a non-conforming use. The Class A Residential Zone is the middle classification of residential uses in the township. The three residential zones prescribed by the ordinance are E, the highest, A, and C, the lowest. All permit the same uses but differ principally in the minimum lot area and frontage required  E requiring generally 40,000 square feet and 200 feet frontage; A, 15,000 square feet and 100 feet frontage; and C, 5,000 square feet and 50 feet frontage.
The zones also differ with respect to minimum floor space area required for dwellings, E and A being the same in this respect but C being approximately 50% less.
The uses permitted in all three residential zones are single, detached dwellings, including professional offices for resident owners, churches, schools and other public buildings, agricultural uses, and the like. As has been pointed out, the amendment under attack permits agricultural uses, so plaintiff's present use remains conforming except as to the dairy barn business, but residential use is now prohibited.
*318 I proceed to set the property in its physical and zoning environment. Directly across Littleton Road from the milk barn is a well-known restaurant, and west of it another eating place, both located in a Business A Zone running from the corner of Littleton Road along the northerly side of Route 10 a depth of about 200 feet, all the way to the Denville Township line. Coming northerly on the west side of Littleton Road we come to another segment of plaintiff's property heretofore mentioned, with a frontage of several hundred feet and having on it some farm buildings and small accessory houses. Next comes a rather new housing development for a distance of several hundred feet, with a few houses along the road, but most of them located on interior roads to the west. This is a small home development. The zoning of the area is Class A Residential.
Next we have a 26-acre tract with a frontage of several hundred feet which was at the time of the passage of the amendment in question classified as Business A. It is an old estate with a very large house. The zoning has since been changed by an amendment to the ordinance classifying this property as another Class III Special Economic Development District, and the property is to be developed and built upon as a research laboratory of a large industrial organization.
Adjoining this on the north is the Sedgefield housing development, which is a large, good, middle-class development in the Class A area, with only a handful of houses fronting on the road, the balance fronting on new streets extending a considerable distance to the west. Halsey Road branches off Littleton Road to the east at this point, marking the northerly boundary of the district, and on the north side of Halsey Road is a small Class A Business District.
The proposed new road leaves Halsey Road about 200 feet from Littleton Road and is to run easterly. North of this new road is a small strip zoned as Class A Residential, running to the large Class C Residential Zone comprising the Lake Parsippany development area. This is a closely built-up, small-house, small-lot area of very considerable size *319 surrounding Lake Parsippany and comprising one of the main residential communities in the township. It originated as a summer resort section but has in recent years become largely used as all-year residences. This area extends all along the northerly boundary of the district to the Hanover Township line.
The Hanover Township zoning ordinance classifies the land adjacent to the boundary, some of which as I indicated is the property of plaintiff, in a Residential AA Zone designed for single-family residences and agricultural uses, with a minimum lot area of 40,500 square feet and a minimum frontage requirement of 150 feet. The Hanover Township line crosses Route 10 and extends south of it to a considerable distance where it intersects the boundary of the Borough of Morris Plains.
There is located south of Route 10 in Parsippany-Troy Hills Township a triangular piece of land practically all of which is owned by plaintiff as has been indicated, and used as part of its dairy operations, classified as A Residential. The westerly boundary of this triangle is the Morris Plains line and strikes Route 10 at right angles about a 1,000 or 1,200 feet easterly of the intersection of Route 10 with Littleton Road.
About three-quarters of the frontage on the south side of Route 10 in this area of Morris Plains is zoned by that borough's zoning ordinance as A-1 Residence, permitting only one-family detached dwellings with offices of residents, churches, schools and other public buildings and agricultural uses. About 200 feet of the frontage nearest to the intersection is zoned as D Business by Morris Plains to a depth of about 200 feet, as is the corner plot on the opposite side of Littleton Road comprising an area of roughly 300 feet frontage by 200 feet in depth. Classification D is the lowest business classification in the borough and permits general commercial and business use, as well as residential use, with apparently no minimum lot size requirement and only a five-foot front yard set-back required. All new commercial buildings in this zone must have surfaced off-street *320 parking space equal to the total floor area used for the business, or 100 times the lot frontage, whichever is greater. All of the land on the south side of Route 10 in Hanover, Parsippany-Troy Hills and Morris Plains in this section east of Littleton Road is used for agriculture, or is vacant, except for three or four old houses on the southeasterly corner in Morris Plains, some of which are used for business purposes.
The business area on the southwest corner of the intersection is presently vacant, but a gas station and shopping center development is in prospect. West of the small commercial area at this southwesterly corner of the intersection along Route 10 the land is zoned by Morris Plains for a considerable distance as A Residential and is substantially vacant.
The plaintiff's land is substantially flat, with some wooded areas in the central part of it and becoming swampy to some extent in the eastern part extending into Hanover Township. Topographically, and from a standpoint of location and other physical features, it is eminently suited for its present agricultural use, for residential development, or for light industrial and like uses, including office buildings and research laboratories, except with respect to the swampy area at the east end. The area at and adjacent to the Route 10 and Littleton Road corner is likewise suitable for retail commercial uses, and in fact has that use now by the dairy barn situate in a commercial environment on the other three corners.
The evidence is most convincing that there is substantial present and prospective market for industrial land sites outside the urban area and in this township, and for the type of industrial development contemplated by this ordinance, resulting from the decentralization or redistribution of industry from the cities, the similar movement of residential development and population representing a large portion of the better labor force and market, and especially the desire of industry with its components of offices and research facilities to have modern spacious buildings and *321 surroundings, and other incidental advantages  all of this made possible and brought about by that vital factor in our modern civilization, the motor vehicle. This trend and market is nowhere better illustrated than in Morris County in municipalities adjacent to Parsippany-Troy Hills, which the record shows in detail, where numerous so-called landscaped or campus-type industries have been established in the last few years with, in most instances, special tailored zoning provisions being made for them as the occasion required.
It also seems clear that industry prefers, and it seems to be to the public advantage, areas zoned in advance and on a long-range basis for such purposes, rather than to have to seek special treatment from a municipality in each instance, with the risk of "getting off on the wrong foot," so to speak. It should be said, it is equally clear there is a demand and market for the premises in question, or most of it, for residential development.
The issues in this case cannot be determined without relating the property in question more in detail to the township as a whole, and its zoning and planning history.
Parsippany-Troy Hills is a very large, sprawling, irregularly shaped township in the east central part of Morris County, comprising 26 or 27 square miles. The maximum distance from the most easterly to the most westerly boundary is about eight miles and from the most northerly to the most southerly about four and a half miles. Bisected east and west by U.S. Route 46 for a distance of six or seven miles through the north central part and State Route 10 for about three miles through the south central part, and north and south by present Route 202 for four miles or so in the west central part and State Route 53 for about two miles in the extreme western end, it lies directly in the path of the residential and industrial development now and since the war progressing westerly from the urban areas at an unprecedented pace.
Its population has increased from about 6,000 in 1930 to over 15,000 in 1950 and an estimated 18,500 to 20,000 now, *322 including about 5,800 patients at Greystone Park State Hospital.
Since 1944, 1,950 building permits have been issued for single-family dwellings, mostly in the last five years. This is indicative of the great residential construction that has taken and continues to take place, largely in development. There are about 11 separate residential communities, three of which, Lake Hiawatha, Lake Parsippany and what I will call Mt. Tabor-Rainbow Lakes, are of some size and age, having originally been established as summer colonies. The other communities, all much smaller, are represented principally by new major housing developments scattered throughout the township. All might be spoken of as middle-class. I think it can be safely said that there are no slums and no large estates.
Commercial development has been scattered and spotty. There are relatively small neighborhood shopping areas in the principal communities and there has been some of the usual highway commercial development, principally along Route 46, consisting of relatively small individual stores and enterprises.
The only industry is found in the present small industrial zone at the extreme northerly tip adjacent to the Lackawanna Railroad in Boonton, now practically filled with four or five electronic plants.
As of the present, the township is only 25 to 30% developed, with the remainder vacant land, some farmed, but with agricultural uses constantly decreasing, and most of it suitable physically and economically for residential use, principally by development. Such development activity is constantly taking place and can be expected to continue indefinitely in view of the strategic location of the municipality for automobile commuting to work in nearby areas and to the cities, and availability of space for so-called country living on a small scale. Perhaps it should be also noted that roughly one-quarter of the municipality is composed of swamp land presently unusable for any productive *323 purpose, and another large segment comprises the Jersey City Reservior.
As might be expected from this picture, the township has been and will continue to experience the usual growing pains on rather a large scale, arising, among other causes, from the constantly increasing need for the municipal and school services for the expanding population, especially in view of the scattered and sprawling pattern of the development. It is, of course, fundamental that the ability to furnish such services must depend largely on local taxes under our present tax structure, levied principally upon the individual home owner.
The economic and physical well-being of the municipality and its inhabitants, both governmental and personal, depends on the ability to furnish the necessary governmental services without at the same time bringing about a confiscatory tax levy. It is a well-known fact in municipal finance that it is extremely difficult to supply required services where assessed valuations rest almost entirely on relatively small, single-family residence properties. The problem is common in greater or lesser degree to many municipalities in our State and elsewhere, especially those on the fringe of urban areas. Parsippany-Troy Hills is perhaps distinguished by the remaining large amount of available land and the local legislative efforts to aid in its ultimate solution.
The zoning and planning history of the township commences in 1945, roughly corresponding with the beginning of the influx of the population. The original zoning ordinance was adopted in that year. The planning board was established in 1946. Planning and zoning have developed progressively since, and there is not yet a final product in all aspects.
There was a major revision of many sections of the zoning ordinance in 1950. The local desire for industry expressed itself in the engagement of an industrial zoning expert in 1952, followed in 1953 by the adoption of the present Industrial District sections of the ordinance. Mr. Hugh Pomeroy, a well-known consultant in the field, was *324 engaged in 1954 and 1955 to draft new subdivision regulations in the light of the Planning Act of 1953, to review and make recommendations concerning the zoning ordinance generally, to commence work on a Master Plan, to study the matter of through highway zoning, and to make further recommendations for industrial zoning since the 1953 revision in that respect had not attracted industrial settlement such as was regularly being established in neighboring municipalities. The township is now served by another firm of consultants working on the completion of the Master Plan and continually advising on further evolution of the zoning ordinance in the light of present problems and future planning.
With the advice of Mr. Pomeroy, Parts 1, 2 and 3 of the Master Plan were adopted in 1954. The 1956 amendment in question, creating the Specialized Economic Development Districts, also came about through his guidance, but it, as well as all preceding steps in the evolutionary process, appears to have been peculiarly the product of the combined efforts of the local agencies working with the advice of the consultant.
As I have intimated, there has been a definite and continuing close correlation of planning and zoning in this township, and the zoning amendment under attack must be considered with that fact always in mind. Where such close correlation exists, zoning is peculiarly a tool and implementation of planning. The latter always embraces or should embrace the former, but it is much broader and has been defined in a leading case as "a systematic development contrived to promote the common interest in matters that have from the earliest times been considered as embraced within the police power." Mansfield and Swett, Inc., v. Town of West Orange, 120 N.J.L. 145, at page 149 (Sup. Ct. 1938).
Part 1 of the Master Plan adopted in 1954 is especially relevant in considering the fundamental issues in this case. I quote the assumptions and objectives found therein:

*325 "Assumptions.
1. That, considering the situation of the Township in the Essex-Passaic-Bergen-Morris County segment of the New York-New Jersey metropolitan area and the developmental forces operating within and on such segment, the population of the Township will continue to increase, with the rate of increase dependent in considerable measure on decisions with respect to developments that are made by the Township itself and expressed in zoning and other regulatory measures.
2. That a substantial part of the increase will come about as a result of the construction of houses by developers, with a primary interest in making their operations as profitable as possible.
3. That the continuing decentralization of industry in the New York-New Jersey metropolitan area will offer an opportunity for the Township to encourage a type of industrial development that can, in appropriate places, be made a harmonious part of the land use pattern of the Township and that will contribute substantially to the tax base of the Township.
4. That large scale agriculture in the Township will continue to decline, both relatively and absolutely, but that certain specialized types of agriculture will become of increasing importance in the development and economy of the Township.
5. That Route 46 will continue to carry increasing volumes of traffic, and be increasingly attractive to roadside business development.
6. That the prospective relocation of Route 202 will add greatly to the traffic importance of this thoroughfare and considerably to the accessibility of parts of the Township.
7. That taxation and the increasing cost of holding large acreages of land unused or in uses of light intensity will result in continually increasing pressures for `development' for the primary purpose of financial advantage.
8. That the interest of the Township requires the maintenance of sound developmental policies as a means of weighing the pressures for private gain in developmental activities against the welfare of the Township as a whole.

Objectives.
1. Generally, to aid in the provision and maintenance of a satisfactory living environment and in the provision of opportunity for beneficial and profitable economic activity.
2. To maintain the exclusively one-family character of the residential development of the Township, and at an over-all low density.
3. To confine higher-density small-lot development substantially to the major community centers where such development now occurs, principally the Lake Parsippany community, the Lake Hiawatha community, and the Mount Tabor-Tabor Park-Rainbow Lakes community.
4. To maintain, protect, and assure the stability of a low density of development in the remainder of the Township that will
*326 (a) encourage the building of houses of a value that will contribute substantially to the tax base in relation to the cost of required municipal services, and
(b) obviate the necessity in the foreseeable future of installing public sewerage systems except as the same becomes necessary in the aforesaid higher density areas.
5. To encourage affirmatively the type of building development referred to in the preceding paragraph.
6. To seek means to rehabilitate any areas that have begun to deteriorate and in such areas and in newer areas to endeavor (a) to discover what characteristics or forces tend to induce deterioration and (b) to undertake, insofar as possible, to correct such characteristics and counteract such forces.
7. To assure that business development along thoroughfares induced by the traffic thereon
(a) will be so laid out as to provide space off the highway right of way for all automobile parking and incidental vehicle movements in connection with doing business and so as otherwise to result in the minimum hazard to traffic, and
(b) will be of such design and site arrangement as to impair as little as possible the desirability of adjacent land for residential development.
8. To seek means to mitigate those characteristics of existing roadside development that are in conflict with the foregoing objective.
9. To assure that business development that serves primarily the resident population of the Township will be located in convenient and harmonious relation to residential development, with adequate off-street parking space and with emphasis on good design.
10. To encourage sound industrial development in suitable locations and in accordance with proper standards of site planning, and to regulate such development in accordance with the requirements of modern and changing technology.
11. To assure that new land development shall provide, in addition to the local streets giving access to the land within the development, its share of the system of collector and arterial streets that development in the aggregate requires; and that intensification of land use adjacent to existing streets, whether through subdivision, zoning change, or otherwise, shall not impair the traffic capacity, safety, and convenience in which the public may be regarded as having rights of user, but shall provide the additional street space necessary to serve the new development and protect the public interest.
12. To assure, to the maximum degree possible, that new land development shall provide, as a part of the development, all the land and facilities necessary to serve the development at its maximum contemplated occupancy and use, without imposing undue costs on property owners or adding to the normal costs of the government of the Township.
*327 13. To evolve and apply principles of community design that will keep to a minimum the subsequent cost of street maintenance and provision of other governmental services.
14. To protect the landscape and the natural aspects of the terrain of the Township and to conserve `natural use' areas, to the maximum degree possible, through protective measures relating to land use and through the skillful application of sound principles of site planning.
15. To consider every question relating to land development that requires a public decision in the light of the fact that the interest of the developer is ephemeral, but that the community will have to live from then on with what the developer does."
We certainly have here a comprehensive plan in broad outline and objective and, without relating or elaborating on the details of the various classes of zones and regulations, we have a zoning ordinance intended to provide for carrying out those features and purposes of it which can be done through zoning. Its emphasis, of course, in a municipality only 25 to 30% developed, is not only on the present existing situation but on the future, standing as the township does in the path of inevitable further growth on a large scale. It is zoning for preparation and prevention rather than, as has been the case in the earlier days of zoning in older and built-up municipalities, merely to hold the line and try to stop the spread of deterioration and blight commenced prior to the beginning of regulation. This modern concept of planning and zoning is absolutely essential if municipalities now semi-rural are to be able to cope with the continuing flood of population expansion.
I therefore proceed to consider more specifically the particular exclusive zone classification of the Specialized Economic Development Districts and the inclusion of plaintiff's property in it.
The municipality seeks to sustain its action primarily, with respect to the necessary purposes of zoning prescribed by R.S. 40:55-32, on the promotion of the general welfare, with a view to encouragement of the most appropriate use of land throughout the municipality. It frankly says that it wishes to maintain the essential residential character of the community without great density of population, to *328 encourage industry in appropriate areas by setting aside land more or less exclusively for it, without unfavorable impact on residential sections, and thereby to secure a future balanced land use leading to a sound municipal economy by non-residential tax ratables contributing to the cost of necessary municipal services for all, which otherwise could not be furnished adequately or only at too great cost to the home owner. Such a result, it is said, thereby indirectly brings about ultimately the accomplishment of the other purposes and considerations set forth in the statute cited.
Is a zoning classification based upon such a purpose and intent a valid exercise of zoning power? I think it is. Zoning is one aspect of the sovereign police power. Such power is not limited to measures directly needful to serve the public health, morals and safety. It may also be invoked to serve the public convenience and general prosperity and well-being. Mansfield and Swett, Inc., v. West Orange, supra, 120 N.J.L., at page 153; Pierro v. Baxendale, 20 N.J 17, at page 28 (1955). The essence of zoning is to provide a balanced and well-ordered scheme for all activity deemed essential to the particular municipality. Berdan v. City of Paterson, 1 N.J. 199, 205 (1948); Kozesnik v. Township of Montgomery, 24 N.J. 154 (1957). Subject to the rule of reason, the kind of community and the kind of balance is exclusively a matter for local legislative determination. Duffcon Concrete Products v. Borough of Cresskill, 1 N.J. 509 (1949). I conclude that a zoning scheme seeking balanced land use to obtain a sound municipal economy by encouraging industry on which taxes may be levied to help meet the deficit in the cost of municipal services to home owners is a proper exercise of the zoning power, subject always to the reasonableness of the classification and regulations enacted to achieve the end both generally and with respect to particular property.
Nor is it arbitrary or unreasonable in the abstract, as a matter of law, to exclude the so-called higher uses such as residential and commercial uses from an industrial district. That principle appears to me to have been settled by the *329 very recent well-reasoned opinion of Mr. Justice Weintraub in Kozesnik v. Township of Montgomery, supra, where he said as follows:
"We are not unmindful that in the infancy of zoning it was the general practice to permit higher uses in the less restricted district. The statute, however, does not so command. Rather, it broadly permits any reasonable scheme which comports with the legislative standards and thus leaves ample room for new ideas. Experience has satisfied many that, for example, homes are no more appropriate in an industrial district than industry in a residential one. In both situations the baleful influences upon residences are the same. Moreover, industry may prefer to avoid the frictions which ensue when discordant uses are side by side. Hence, in seeking a well-balanced community [citing cases], a municipality may conclude its welfare is better served by avoiding motley activities within its districts [citing cases]. In every case the question is one of reasonableness under the circumstances. The point sufficient for the present is that there is no rule of law, statutory or constitutional, which ordains that any use has an exalted position in a zoning scheme entitling it to move everywhere as of right.
The problem is the familiar one of classifications. Thus where the facts were found to demonstrate that it was unreasonable to exclude commercial activity from a light industrial district, the restriction was held invalid, Katobimar Realty Company v. Webster, 20 N.J. 114 (1955), whereas when a reasonable basis existed for differentiating between motels and boarding or rooming houses, the exclusion of the former was upheld. Pierro v. Baxendale, supra (20 N.J. 17). In both cases this court divided 4 to 3, but the division did not reflect disagreement as to basic principle but rather as to the application of the principle to the facts of the case."
The question of reasonableness under the circumstances with respect to the Special Economic Development District in question, comprising only plaintiff's land, is more difficult. It must be approached, of course, in the face of the presumption of validity of local legislative action and the principle of judicial review that such will not be struck down unless clearly unreasonable.
The physical facts of the property and its surroundings have been set forth at length and need not here be repeated fully. We are dealing essentially with vacant land used for agricultural purposes, except as to the Route 10-Littleton Road corner. It was formerly zoned for residential use, with agriculture also permitted. The amendment under *330 attack permits the present use of agriculture and the light industrial uses specified, but prohibits residential development and commercial use. The commercial use at the corner remains non-conforming. The land, or the greater part of it, is equally suitable for residential or light industrial use of the type contemplated. On parts of two sides the district is approached by present residential communities.
Again the future or planning purpose of the amendment must not be lost sight of. The proofs are ample that there is a market, present and prospective, for both industrial and residential purposes. So it is not a case of freezing land into idleness or non-productivity. Nor is it a situation where there is substantially no other land available for residential development. The tract is only a minute fraction of that available in the township for house building.
The proximity of homes to the west and north does not require the area to be given a residential classification. The adjacent sections are not that much built up or that close, considering the restrictive and buffer safeguards prescribed. This is further pointed up by the subsequent creation of another Special Economic Development District, Class III, for a large industrial laboratory opposite the plaintiff's land on Littleton Road between the two housing developments leading back from that highway. So I cannot say it is so unreasonable, under the circumstances here, to exclude residential use.
Suitability for several uses does not require zoning to permit all those uses as a matter of law. If the contrary were true, any land in an undeveloped community physically suitable for both residence and industry would always have to be classified to permit both, the very antithesis of sound zoning. It is again a matter for local legislative action with which the court will not interfere as a matter of judgment. By the same token, if the local body had put part of the tract in a residential zone, the court would likewise refuse to overrule it.
But the prohibition of any commercial use at and closely adjacent to the Route 10-Littleton Road corner, I *331 look at in a different light. Here we have not a case of vacant land but a commercial use for a considerable period of time, with similar uses at the other three corners. If there were no such actual uses, and all four corners were vacant, I could see no legal objection to zoning against business, even though the land might be physically suitable for it, as is all highway frontage. But when there is an actual commercial use in an actual commercial environment, including lands in this and adjoining municipalities, and the township is doing comprehensive rezoning of a large tract, as is the case here, I think it is unreasonable completely to prohibit that use in a limited area around the corner. The court cannot, of course, prescribe the limits of such a use; that is for the township council.
I conclude I must set aside that portion of the amendment which adds subsection (f) to section 73.25 of the ordinance, to the extent of creation and description of the "Alderney District" therein. Since the effect thereof is to restore all of the plaintiff's land to a residential zone, the prohibition of which use I have held to be valid, I will defer the operative effect of this part of the judgment for 90 days to give the defendant an opportunity to further amend the ordinance to meet the legal objection found, if it cares to do so.
The plaintiff's next ground of attack relates to the regulations imposed by the ordinance dealing with intensity of use and covering minimum lot size, minimum frontage, front, side, and rear yard requirements, and maximum coverage of lot by buildings. As has been indicated, the first two items vary as to each of three classes of Specialized Economic Development Districts and the remainder are different primarily as between Classes I and II on the one hand and Class III on the other. It is claimed that the variations between the districts are arbitrary and capricious, insofar as Class III is concerned, because there are insufficient material differences between the districts, and that some of the Class III restrictions are in themselves so burdensome as to be unreasonable.
*332 There would seem to be no sound reason why a municipality cannot have different grades of light industrial districts with different density requirements, in the same way and on the same theory that it has similarly different grades of residential or commercial districts for different purposes and degrees of use as is found in this ordinance. I do not feel the plaintiff has sustained its burden of proof that the differences in requirements between the three classes is so discriminatory against it as to be invalid.
I have some doubts concerning the particular restrictions in Class III, particularly those with respect to lots which do not adjoin residential districts, but considering that the general purpose of all such requirements is to avoid injurious effect or impact on adjoining areas with different use classifications than other light industrial uses within the same zone, I cannot say they are unreasonable as a matter of law. Where the court simply has doubts, it must not disturb the local legislative determination.
Finally, we come to plaintiff's objections to the site plan approval provisions of the amendment. The contention that there is no statutory authority to delegate such to the planning board, as well as the whole concept of site plan approval, seems to have been disposed of adversely to plaintiff's argument by the recent Kozesnik decision, where it was pointed out that the planning board is peculiarly the appropriate local body to determine such matters. The delegation to the planning board here is preliminary to final action by the building inspector in issuing or denying the permit. Even though the planning board action may be binding on the building inspector and not merely recommendatory, I feel it is within the letter and spirit of authority granted by N.J.S.A. 40:55-1.13. The absence of mechanical procedural provisions is not fatal. The planning board must hold a hearing on notice and otherwise conform to accepted standards of due process in administrative proceeding.
Justice Weintraub in the Kozesnik case was not required to decide, however, just how far the planning board *333 could go in such approvals, in the sense of what items it could pass upon and what it could not. I feel a planning board may only consider those having a relation to the public interest, and not those which are merely matters of private concern in the use of property, having no connection with or effect upon adjoining property owners, adjoining areas outside the district or the community and public interest at large.
The court should construe ordinance provisions so that they will be constitutional, if at all possible. I find Items 1 through 4 under the heading of Site Plan Approval, dealing with specific matters, can and should be so construed that they are valid insofar as the subject matter thereof concerns or affects adjoining property owners, adjoining areas outside the district, or the community and public at large, on the basis of the general standards set forth in subsections 4(a), (b), and (c) in the first paragraph of section 73.14b, which standards I find to be sufficiently adequate. Beyond that the board can have no concern with how a man wishes to use his land. The requirements must be so interpreted and applied.
By the same token, Item 5 under Site Plan Approval is so broad on its face as inevitably to be concerned with matters not within the limitations just discussed, and I therefore hold that item to be unconstitutional and void. To conclude otherwise would permit interference with private land use and the conduct of private business for no valid public purpose or need, and permit the intrusion of aesthetic considerations on a basis beyond that of conservation of the value of property. As to the latter consideration, see Pierro v. Baxendale, supra, 20 N.J., at page 28.
In view of my conclusions there is no necessity for injunctive relief. A judgment may be presented accordingly. No costs to either party.