51 N.J. Super. 589 (1958)
144 A.2d 425
THE SADDLE RIVER COUNTRY DAY SCHOOL AND CHESTNUT RIDGE LAND CO., INC., PLAINTIFFS-APPELLANTS,
v.
THE BOROUGH OF SADDLE RIVER, DEFENDANT-RESPONDENT.
WILLIAM C. WOLLEN AND ELSIE WOLLEN, HIS WIFE, CAMILLUS CHRISTIAN AND JOYCE CHRISTIAN, HIS WIFE, JOHN C. CONKLIN AND HARRIET CONKLIN, HIS WIFE, JOSEPH R. WENY AND RUTH WENY, HIS WIFE, DUNCAN STRAWBRIDGE AND MARIETTA STRAWBRIDGE, HIS WIFE, AND ROY T. HURLEY AND ESTHER HURLEY, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
THE SADDLE RIVER COUNTRY DAY SCHOOL AND CHESTNUT RIDGE LAND CO., INC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1958.
Decided August 29, 1958.
*591 Before Judges STANTON, HALL and GAULKIN.
Mr. James A. Major argued the cause for appellants.
Mr. Warren Dixon, Jr., argued the cause for respondents.
The opinion of the court was delivered by HALL, J.A.D.
These cases involve the legality of an amendment to the zoning ordinance of the Borough of Saddle River affecting the formerly unrestricted right to use property in the borough for private school purposes and the validity of the issuance of a building permit, subsequently recalled, to Chestnut Ridge Land Co., Inc. (which we will call the "land company"), the owner, and The Saddle River Country Day School (hereafter designated as the "school"), the lessee, for structural alterations of a residence property incident to the conversion thereof for use as a private day school. The lower court upheld the amendment, and its applicability to the premises in question, *592 declared the building permit invalid and enjoined the land company and the school from altering the building until approval had been obtained for use of the property as a school pursuant to the ordinance as amended and a building permit secured in conformity with the building code and from using the house for other than one-family dwelling purposes until a certificate of occupancy for any other use had been duly issued in accordance with applicable local legislation. The school and the land company appeal. The zoning ordinance amendment is attacked on its face as matter of law. The questions concerning the building permit involve both law and facts, the latter not in any substantial dispute.
Saddle River is located in north central Bergen County and has an area of six square miles, much of it hilly country. It is described as a highly desirable residential community appealing to persons wishing an expanse of land and a rural atmosphere, and as such one of the most attractive in the county. The present population is slightly less than 1,400. Its growth has not been rapid, the nature and pace thereof no doubt having been largely controlled by zoning ordinance requirements to be adverted to shortly. Such requirements have tended to development along the line of large and expensive homes on substantial tracts of land. Less than 1% of the area is used for business purposes and that is devoted to retail stores and service establishments concentrated in the center of the community and designed to serve the needs of the residents. There is no industrial use. The single public school accommodates about 250 local children from kindergarten through grade eight. Secondary education for about 70 borough students is provided at Ramsey High School. Probably half of the high school age children are educated in private schools outside the municipality. There is also a private nursery school in the town for those of pre-school years. The general character of the community may be further illustrated by the fact that the borough has no police department, law enforcement being served by three part-time marshals.
*593 The premises directly involved in this litigation is the so-called "Denison estate"  an older 17-room mansion on an irregular tract of some 20 acres with varying topography, bounded roughly by the westerly side of Chestnut Ridge Road, the northerly side of Woodcliff Lake Road and the easterly side of Allendale Road. These roads are principal inter-community arteries. The adjacent area was referred to by one expert witness as the focal point of highest values in the borough, because of the elevation, fine view and value of homes that have been built in the vicinity. These homes, mostly of recent construction, include those of plaintiffs in the Wollen suit and others. They are principally of the estate type on tracts ranging from slightly over 2 to 26 or more acres and with values of from something over $40,000 to close to $150,000. In the early part of June 1957 the Denison estate was owned by Leonard C. Bierbrier and wife. Bierbrier was mayor of the borough. It was on the market for sale, the Bierbriers apparently desiring to move out of the municipality. The broker was Albert Zecker, a local resident.
The borough zoning ordinance, adopted in 1930, provided for only three use districts, A and B residence and business. The A residence zone comprised at least 95% of the total municipal area. Permitted uses were broad, including some commercial activities, but minimum area, frontage, dwelling size and yard requirements were substantial. For example, a minimum lot area of two acres and frontage of 200 feet were required. Off-street parking provision on a specified formula basis was also made mandatory for all non-residential uses. The B residence district permitted the same uses, but imposed very less stringent area, frontage and yard restrictions and no minimum dwelling size. The land encompassed within this district was a minute fraction of the total. The business zone allowed only usual small community sales and service establishments plus all uses permitted in the residence districts. This zone, again, included only a very small percentage of the borough area.
*594 Permitted uses in the A residence district, and so also in the B and business zones, were single-family dwellings, including therein a professional office of the resident owner or lessee and home occupations; agricultural, horticultural, dairying, market gardening and nurseries with necessary buildings and including sale on the premises of products raised or produced thereon; places of worship with appurtenant buildings; central telephone exchange; public library, museum, art gallery and community center building; structures used by any level of government for public purposes excluding warehouses and workshops; and "school or other educational institution, including playgrounds and accessory buildings." Non-conforming uses are relatively few.
Note should also be taken that certain other uses were permitted in all zones as "special exceptions" (R.S. 40:55-39(b), as amended), viz., "hospitals, clubs, sanitariums, cemeteries, hotels, orphanages, camps, boarding houses accommodating over 6 persons, clinics, commercial airports and air fields * * *," on recommendation of the board of adjustment to the governing body for the latter's approval or disapproval.
Procedurally, the zoning ordinance requires the issuance of a building permit by the building inspector before any building or structure may be erected or altered, and a certificate of occupancy by the same official before any new building or structure may be used or occupied or any other (i.e., existing) building, other than an existing residence, may be used or occupied as a residence or for living purposes. The issuance of the latter certificate is made dependent on compliance not only with the zoning ordinance, but also with the building and sanitary codes and "any other ordinance of the Borough * * *."
The borough building code, in effect throughout the period here involved, is a most voluminous and detailed document of some 350 printed pages. It is the 1950 edition of the "Basic Building Code of the Building Officials Conference of America, Inc.," prepared for adoption by municipalities anywhere in the country. Some of its procedural provisions *595 and nomenclature do not precisely conform to New Jersey concepts. While it was apparently adopted in Saddle River verbatim and without any adapting language, that fact does not affect or impair its procedural or substantive applicability in the present situation. Suffice it to say that the code requires a building permit issued by the building inspector thereunder before proceeding with the alteration of a residence building for conversion from dwelling to school use, based on an application, plans and specifications demonstrating compliance with all pertinent code provisions. In addition, the code requires a certificate of use and occupancy issued by the same official before a building "altered to change from one use group to another" or for which no such certificate had been heretofore issued shall be used or occupied, certifying that the work has been completed in accordance with the provisions of the issued permit. The interrelation of the code to the zoning ordinance in these respects will be hereafter considered. There is no provision in the code as to procedure in the event of the improper issuance of a permit or certificate by the inspector.
We should also mention that Saddle River has a planning board which had adopted a master plan. N.J.S.A. 40:55-1.10.
To come to the chronology of events leading to these suits, beginning in the early part of June 1957: Douglas Ogilvie was a teacher in a boys' private school in Englewood and an applicant for a teaching position in the Saddle River public school. He was hopeful of starting a private school of his own somewhere in the general area some time in the near future. He was acquainted with John C. Alford, a substantial resident of Saddle River and member of its board of education, who was interested in establishing such a school to provide upper grade and secondary education for boys and girls of the borough and nearby communities. They quickly decided to work together, Ogilvie on the scholastic end and Alford on the financial, and two days after their first discussion of the venture, discussed with Zecker the acquisition of the Bierbrier property as a site. *596 Negotiations quickly ripened into a bargain. About June 21 Alford formed the land company, a business corporation of which he owned all but two qualifying shares. On June 24 an unconditional contract of sale was signed between the Bierbriers and the land company, prepared by counsel for the former. It called for a price of $105,000, $35,000 in cash (of which $5,000 was paid on the signing of the agreement) and the balance by purchase money mortgage amortized at $10,000 a year plus interest. The closing date was fixed for August 15. A few days later Ogilvie formed the school as a non-profit corporation. The certificate of incorporation was filed July 9. The trustees were members of Ogilvie's family and his friends. Early in July the land company leased the premises to the school, as of the first of that month, even though the company had neither title nor possession, at a rental of $15,000 per year, plus any increase in taxes and 10% of the tuition paid by all pupils after the first 50. (50 or 60 students were estimated to be necessary for the venture to break even financially.) The lessor was to be responsible for exterior repairs. Apparently interior alterations, repairs and necessary equipment were the responsibility of the tenant. Alford and his father later gave and loaned considerable money to the school.
When the execution of the contract of sale became known, strong opposition immediately developed to the proposed use of the property. The opposition seems to have been based on the argument that the school would amount to invasion of a high-class residential area by a highly different use which it was claimed would increase traffic and affect highway safety through transportation of pupils and faculty, disturb peace and quiet by the noise of playground, athletic and other activities, and decrease property values. From then on a race ensued, as frequently and unfortunately happens in such situations, between opponents seeking governmentally to block the proposal and those interested in it attempting to secure some sort of indefeasible legal status, for a venture entirely legal and proper when planned and the initial step taken and investment made, before opposition *597 could be translated into effective restriction. At a planning board meeting held on July 8 neighbors urged the board to concern itself with the matter and a zoning ordinance amendment was suggested. Petitions of opposition were circulated and filed and some 300 citizens appeared at the meeting of the mayor and council on July 12 urging action to prevent school use of the premises. The meeting was adjourned until July 19 at which time the zoning amendment in question, prepared by counsel for opposing property owners (who appears for them as individual plaintiffs as well as specially for the borough in this litigation) and submitted on their behalf at the meeting of the 12th, was introduced and unanimously passed on first reading. It was scheduled for public hearing and final adoption on August 9 and such took place according to schedule.
This amendment changed the broad language of "school or other educational institution, including playgrounds and accessory buildings" in the list of permitted uses in the A residence zone by the substitution of the following therefor (automatically also thereby governing this type of use in all zones):
"Public, private or parochial school; provided, that the location and extent of such school shall be subject to review and recommendation by the Planning Board, whose finding shall give due consideration to the lessening of congestion in the streets; to securing safety from fire, panic and other dangers; to promoting health, morals and the general welfare, to providing adequate light and air; to preventing of overcrowding of land or buildings; to the avoidance of undue concentration of population; to the conserving of the value of property; and to encouraging the most appropriate use of land within the Borough. Where such recommendation applies to a public school the action of the Planning Board shall be subject to the provisions of New Jersey Revised Statute 40:55-1.13. Where such recommendation applies to a private or parochial school, such finding or recommendation may be overridden by a majority vote of the Mayor and Council."
In the interim, on the part of the school and land company, the closing of title was advanced from August 15 and held during the day of July 12 preceding the council meeting that evening, although the fact of the transfer was not disclosed *598 at the meeting. The reason, according to the attorney for the sellers, was the opposition that had developed. The closing was had without the purchaser being represented by counsel or a title policy or attorney's certificate of title being procured.
A brochure or prospectus was prepared and mailed about July 9 and students were solicited for the fall term. About the same time some proposed faculty members were lined up and thereafter some equipment purchased. The Bierbriers did not relinquish personal occupancy until the early part of August and their goods remained until past the middle of the month. Ogilvie began to use a room in the house for an office and to tutor three students prior to the latter date. Plans called for holding classes for grades 6 through 10 in the house, with the grounds used for playgrounds and athletic fields, parking space and other accessory activities. There was no actual use of the property as a day school, in the true sense, prior to the commencement of the litigation.
Interior alterations were necessary to adapt the dwelling for school use, quite apart from any requirements of the building code. In addition, and even more important, the conversion of a residence to school use involved a change from one use group to another under the code, with certain very definite and salutary structural requirements imposed thereby in the interest of the health and safety of occupants. As has been stated, where such a change was involved, the code prescribed that there could be no use and occupancy for the new purpose until the certificate of use and occupancy had been issued certifying compliance therewith.
Ogilvie engaged an architect, Macksoud, on July 26. The latter drew some kind of preliminary plans to show the alterations desired, although he did not then know what the borough code required. There was a conference with the building inspector, himself a registered architect of many years standing, on July 30, at which time Macksoud learned of the code and reviewed his plans with the inspector, who indicated thereon what would be required. Further plans were drawn, based largely on the original floor plans *599 of the house, and a single copy submitted to the inspector on August 6, at which time the building permit was applied for and the form filled out. It was issued at once. The application was deficient. The printed form was completed only to the extent of stating that a conversion of an existing building was involved at a cost of $3,500 and that none of the artisans had been selected. The code called for the submission of two sets of plans and specifications of the work to be done. There was only one set of plans and no specifications. The plan showed either violation or non-compliance with the important code provisions as to ventilation, lighting, floor area per occupant and enclosure of stairways for a structure to be used as a school. The building inspector conceded at the trial that if the work shown on the plans was done, the building would not meet the requirements of the code for the proposed use. There is nothing before us to show that the plans submitted demonstrated adequate provision for off-street parking or compliance with any other applicable plot-plan requirements of the zoning ordinance. As the trial court put it, "* * * to say the least there was undue haste. * * *"
On August 8 and 9 two carpenters did some work in the house, minor in nature and extent. At the meeting of the governing body on the 9th, at which the zoning ordinance amendment was finally adopted, a resolution was also unanimously passed directing the building inspector to recall the permit. This action was taken, not on the basis of the amendment, but on the ground that the permit had been improperly issued in the light of the deficiencies mentioned. The inspector sought to recall it, but the school contended it had acquired vested rights and refused to stop the work and it continued until restrained by court order a couple of weeks later.
The action of the mayor and council on the 9th quickly produced a flurry of litigation. The school and the land company brought suit against the borough asking for a declaration that the amendment was invalid and that the school at least enjoyed a non-conforming use at the time *600 of its passage. An injunction to restrain interference with the school operation was sought. The recall of the permit was not specifically attacked. The borough filed a counterclaim, to compel the surrender of the permit and to restrain alteration of the building except in conformity with a building permit properly issued in accordance with the code and use of the property as a school until approval had been obtained pursuant to the zoning ordinance amendment and a legal certificate of occupancy issued. The pleading asserted legality of the amendment and invalidity of the building permit and denied that the school had acquired any protective status. At the same time the individual plaintiffs filed a separate suit against the school and land company substantially on the same basis and for the same relief as in the municipality's counterclaim. No question was raised below or here as to the procedural right to any of the relief prayed for. The suits were consolidated for trial and the lower court found against the school and land company in all particulars.
We deal first with the matter of the validity of the ordinance amendment. We are directly concerned only with that question as it relates to private schools of the type here involved. Appellants contend that the scheme prescribed thereby amounts to an unlawful delegation of legislative power to the planning board, an administrative agency. The lower court upheld the delegation on the basis that the power granted to the board by the amendment was only for review and recommendation and that such was authorized by the Planning Act. N.J.S.A. 40:55-1.13.
Consideration of the issue requires initially a close examination of the amendment to determine just what it purports to do. While at the outset it would appear to permit public, private or parochial schools on any piece of property (subject to the uniform area, frontage, yard, etc., requirements) in any zone in the borough, i.e., a permitted use on the same basis as a single-family residence for example, the proviso immediately following, "provided, that the location and extent of such school shall be subject to review and recommendation *601 by the Planning Board * * *" (emphasis ours), at once changes the situation from an absolute right to something quite different. "Location" can only refer to a specific piece of property, i.e., whether a particular parcel can be used for school purposes at all, and not just to placement of school buildings and facilities on it. The meaning of the word "extent" is obscure; it could not seem validly to refer to educational extent, for that is no function of zoning or business of any administrative agency under a zoning ordinance. It would appear to be necessarily confined to physical extent, plot plan, or layout on the particular premises or some other feature properly within the field of zoning. Next come the considerations or standards upon which the board's finding must be based. They are nothing more than the fundamental purposes of zoning prescribed by R.S. 40:55-32 which must constitute the underlying basis and criteria for all zoning regulations. Cf. Ward v. Scott, 11 N.J. 117 (1952). But we need not stop to consider further their validity or sufficiency in the present connotation. Finally with respect to a private or parochial school, comes the inferential mandate that final decision on whether such a use will be allowed on a particular property in Saddle River is vested in the mayor and council. The "review and recommendation" of the planning board appears to be just that  something more than a mere report, but not necessarily conclusive. Such is, however, given overriding weight, since it stands unless overturned "by a majority vote of the Mayor and Council," by which must be meant a majority of the whole membership of six councilmen and the mayor. (R.S. 40:87-1, as amended). See N.J.S.A. 40:55-1.13, third paragraph. So we construe the intent and effect of the proviso to be that private school use of any parcel in the borough is not to be absolute at all, but dependent on the individual determination of the governing body in each case after Planning Board recommendation  something akin to the "special exception" provided for in R.S. 40:55-39(b), as amended, which we will further refer to shortly.
*602 The statutory derivation of the provisions of the amendment bears close scrutiny and throws light on the question before us. Sanction for the devised treatment and procedure is obviously sought in section 13 of the Planning Act of 1953. N.J.S.A. 40:55-1.13. But we conceive that the principal provisions of that section have quite a different purpose than that for which they are sought to be here employed. The broad basic design of section 13 is to require review and recommendation by the planning board, in a municipality where any portion of a master plan has been adopted, before any public project therein is undertaken by the governing body, school board or any public agency, federal, state, county or municipal. The purpose relates to the broader concept of planning and not necessarily to zoning at all  i.e., to seek to correlate the proposed project to the master plan, especially as to location, the plan, of course, having no binding effect (Passaic Junior Chamber of Commerce, Inc., v. Housing Authority of the City of Passaic, 45 N.J. Super. 381, 392 (App. Div. 1957)), but very likely having proposed sites therein for future public improvements. As the section puts it:
"The planning board shall have full power and authority to make such investigations, maps and reports and recommendations in connection therewith relating to the planning and physical development of the municipality as it deems desirable." (Emphasis ours)
The particular agency, and if it is a municipal one, the local governing body as well, may override the board's recommendation only by a majority of its full membership. We are not required to consider here the validity or legal effectiveness of the statutory provisions where a governmental project is other than a municipal one.
Since obviously these mandatory reference provisions, on their face, can have no application to a private school project, the borough and the individual plaintiffs seek to find statutory warrant for the proviso of the amendment, and thus accomplish the same kind of a result as to a non-public institution, under language found in the second paragraph of *603 section 13: "The governing body may by ordinance provide for the reference of any other matter or class of matters to the planning board before final action thereon by any municipal public body or municipal officer having final authority thereon * * *." This language is very broad, but we think its scope is not unlimited. The device cannot be used, willy-nilly, as a catch-all or depository for just every type of municipal problem. It must be read and interpreted in the light of the context of the whole section, i.e., the broad and general subject of planning, "the planning and physical development of the municipality." In the only judicial appraisals thereof so far, it has been found a valid basis for delegating to the planning board the matter of approval of the details of site plans required by local zoning ordinances as a pre-requisite to the issuance of building permits for certain special types of industrial uses. Kozesnik v. Montgomery Township, 24 N.J. 154, 178, 186 (1957); Newark Milk and Cream Co. v. Township of Parsippany-Troy Hills, 47 N.J. Super. 306, 332 (Law Div. 1957). But the present Chief Justice was very careful to point out in the Kozesnik opinion that the legislative decision as to what use should be permitted on the property in question had been fully made in the ordinance and the reference to the planning board was not designed to determine whether a given use should be permitted or some restriction should be relaxed (24 N.J., at pp. 178, 186). We are of the opinion that the amendment does, by intent and effect, refer to the planning board for recommendation and the governing body for final decision whether a private school use shall be permitted at any given location. We conclude that such goes beyond the authorization contained in the Planning Act.
Furthermore, considering the amendment as an attempt, in effect, to treat non-public schools as special uses, it is contrary to the provisions of the zoning enabling act. Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405 (1952). Even apart from questions of the so-called standards set forth, the scheme differs only in degree, in the procedural sense, from that involved in the recent case *604 of Rockhill v. Chesterfield Township, 23 N.J. 117 (1957). In that zoning ordinance all uses except residential and agricultural were designated as "special" and referred to the planning board for review and recommendation, followed by final action by the governing body as to whether the use should be permitted. While the ordinance was held invalid on the basis that it amounted to a negation of the basic concept of use zoning by districts in accordance with a comprehensive plan, the intimations of the opinion seem clear to us that the allowance of a valid "special use" as to a particular piece of property must conform procedurally to the pattern of the zoning enabling act and, therefore, that a planning board is not the agency to which such a determination may be delegated.
Such special uses, denominated "special exceptions" in New Jersey, are specifically provided for in our zoning law (R.S. 40:55-39(b), as amended), under which the board of adjustment is the only agency empowered to hear and decide requests for same "in accordance with the provisions of any such ordinance," i.e., on the basis of standards specified therein. (The Supreme Court has held, despite the language of the sub-section, that the board's authority in such instances may be made merely recommendatory by the local ordinance, with final approval reserved to the governing body. Schmidt v. Board of Adjustment of City of Newark, supra, 9 N.J. at pages 419-420.) Under the scheme laid down by our enabling act, zoning must be accomplished by the creation of appropriate districts in which permitted uses are specified in the ordinance, with regulations respecting the same uniform throughout the district and similarly spelled out in the legislation. R.S. 40:55-31, as amended. The only variations from such a pattern permitted by the statute are "special exceptions" and "variances" provided for by R.S. 40:55-39, as amended. Treating the Saddle River amendment as an attempt to treat non-public school uses as "special exceptions," it must likewise fall since the board of adjustment is left out of the procedural scheme contrary to the statute. R.S. *605 40:55-36 and 40:55-39, both as amended. The matters committed to the board by the statute and the exercise of its powers may not in any way be circumscribed, altered or extended by the municipal governing body. Duffcon Concrete Products, Inc., v. Borough of Cresskill, 1 N.J. 509, 515-516 (1949); Tzeses v. Board of Trustees of Village of South Orange, 22 N.J. Super. 45 (App. Div. 1952).
For the reasons given, the amendment, except for the initial phrase "Public, private or parochial school," is invalid.
Appellants also contend that the amendment is further invalid on its face because it unconstitutionally discriminates between public schools on the one hand and private and parochial schools on the other, thus denying the latter the equal protection of the laws guaranteed by the Fourteenth Amendment. In view of our holding above it is not necessary to pass on the point. The general subject of school zoning was considered in Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 350 (1953). See also Andrews v. Board of Adjustment of Ocean Township, 51 N.J. Super. 69, 72-73 (Law Div. 1958). Cf. Lumpkin v. Township Committee of Bernards Tp., 134 N.J.L. 428 (Sup. Ct. 1946).
Finally we come to the question of the validity of the issuance and recall of the building permit. At the outset we should note that the Saddle River zoning ordinance and building code each provide for a building permit. We believe it can be a single document, but since it serves two purposes, with two different sets of criteria, both must be met before it may be properly issued. Under the zoning ordinance, the application and plans submitted must show compliance of the proposed structure or alteration with all requirements of that ordinance, viz., permissible use, lot area, frontage, yards, off-street parking, etc. Such has nothing to do with the requirements for the permit under the building code where only compliance with that code is concerned, which in turn has nothing to do with zoning regulations. It is the inspector's duty to make certain before a permit is issued that compliance with the requisites of both ordinances is demonstrated. We are here concerned only with *606 the building code aspects, even though, as we have indicated, the appendices submitted to us do not show whether the application data established compliance with all pertinent zoning regulation requirements.
Factually, as we have earlier detailed and as the lower court most properly found, the application was defective, particularly in the failure to submit specifications, and the plans as submitted showed lack of compliance with or violation of important requirements of the code in the case of a conversion of use from residence to school. Clearly the permit should not have issued. Appellants' suggestion that the defects and violations should be overlooked because the school furnished everything the inspector required and because the alterations would have to comply with the code on completion regardless of the plans originally submitted, would, if followed, largely render nugatory its purpose and effectiveness.
It is now definitely settled in our law that a municipality is not estopped from revoking a permit invalidly issued even where the invalidity was not the fault of the applicant and the latter had proceeded to do some work in reliance thereon. Esso Standard Oil Co. v. North Bergen Township, 50 N.J. Super. 90 (App. Div. 1958). See 9 Rutgers L. Rev. 697, 716-718 (1955). Our situation is not one where a debatable interpretation of the ordinance was involved, if the rule is to be varied by reason thereof. Cf. Jantausch v. Borough of Verona, 41 N.J. Super. 89 (Law Div. 1956), affirmed 24 N.J. 326 (1957). Furthermore, comparatively nothing of real substance had been done to the building between the issuance of the permit on August 6 and the recall of it by the building inspector on Monday, August 12 at the direction of the mayor and council. Under all the circumstances, no vested rights or indefeasible status were acquired by the school as a result of the issuance or acts done thereafter. We need not consider the question whether a valid ordinance change after the legal issuance of a permit may be effective to bar continuation of construction. See *607 Gulf Oil Corp. v. Vogel, 50 N.J. Super. 324, 328 (App. Div. 1958).
We see no objection to the revocation or recall procedure here followed. Since no question under the zoning ordinance was involved, there was no occasion to require resort to the appeal procedure to the board of adjustment prescribed by R.S. 40:55-39(a) as amended, even if it be considered that a municipal governing body must conform thereto where its building inspector has issued a permit contrary to that ordinance (which we do not pass upon). Cf. Adler v. Department of Parks and Public Property of Irvington Tp., 20 N.J. Super. 240 (App. Div. 1952); Jantausch v. Borough of Verona, supra. No comparable administrative procedure with respect to the building code is prescribed by it or by any statute. A situation like the present one calls for prompt and effective action from the municipal standpoint to protect the public interest and prevent non-compliance with the code. After a summary revocation, anyone aggrieved may demand and obtain a local administrative hearing or seek judicial relief immediately. Cf. Esso Standard Oil Co. v. North Bergen Township, supra. Appellants chose the latter and the matter has been fully heard. They have not been prejudiced by the procedure followed at the municipal level.
The judgment of the lower court was in error in declaring that the zoning ordinance amendment was valid and operative on the premises in question and in enjoining appellants from altering the building until they had obtained approval of the use thereof for a school pursuant to the amendment. It is modified accordingly and, as so modified, is affirmed. No costs on the appeal to any party.