# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2992-22

C.W. and J.W.,[1]

    Plaintiffs-Appellants/
Cross-Respondents,

v.

C.M.K.,

    Defendant-Respondent/
Cross-Appellant,

and

P.F.,

    Defendant-Respondent.

_____

        Argued March 20, 2025 – Decided March 26, 2025

        Before Judges Mawla, Natali, and Walcott-Henderson.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FD-03-1043-22.

---

[1] We use initials to protect the privacy of the parties. <u>R.</u> 1:38-3(d)(3) and (12).

Eric R. Foley argued the cause for appellants/cross-respondents (Law Office of Louis Guzzo, attorneys; Eric R. Foley, on the briefs).

T. Gary Mitchell argued the cause for respondent/cross-appellant C.M.K. (Jennifer Nicole Sellitti, Public Defender, attorney; T. Gary Mitchell, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Division of Child Protection and Permanency (Mary L. Harpster, Deputy Attorney General, on the statement in lieu of brief).

Jennifer Nicole Sellitti, Public Defender, attorney for minor C.F. (David B. Valentin, Assistant Deputy Public Defender, on the statement in lieu of brief).

PER CURIAM

Plaintiffs C.W. and J.W. appeal from: an October 21, 2022 order denying their motion for custody of C.F., who is defendant C.K.'s biological son; an October 27, 2022 discovery order; and a May 5, 2023 order entered following a trial denying plaintiffs custody and visitation with C.F. Defendant cross-appeals from a June 6, 2023 order granting plaintiffs telephone contact with C.F. We affirm on the appeal and reverse on the cross-appeal.

By way of background, J.W. is C.K.'s cousin. In 2016, C.F. and his parents, C.K. and P.F., were the subject of abuse or neglect proceedings initiated by the Division of Child Protection and Permanency (Division) when C.F. was

2

approximately fifteen months old. By all accounts, P.F. has not been involved in his son's life and did not participate in the FN proceedings or in this case. C.F. was in C.K.'s custody, but C.K. suffered from substance abuse problems. As a result, the Division removed C.F. from C.K.'s care. The child was first placed with plaintiffs as relative resource parents in January 2017.

To continue the placement, plaintiffs became licensed resource parents with the Division. During the placement, plaintiffs and C.K. remained in close contact, and they assisted her with employment and housing. They also kept C.K. up to date about C.F.'s development, including his progress in school.

C.F. was reunified with C.K. in November 2017. In November 2018, plaintiffs watched C.F. on several occasions at C.K.'s request and assisted C.K. as she began to live independently. This arrangement continued until July 2019, when C.F. was removed again by the Division and placed with plaintiffs. C.F. remained in placement with plaintiffs through June 2022.

Plaintiffs addressed all of C.F.'s needs during his placement, including any additional educational and developmental support he needed. They provided him with health insurance and took him for treatment at the Children's Hospital of Philadelphia, which was not covered by the State-provided insurance.

A-2992-22

C.F. developed personal relationships with other children, including those in plaintiffs' family, at daycare, in after school sports, and in the neighborhood. He referred to plaintiffs as his mom and dad.

The Division reunified C.F. with C.K. on June 24, 2022. Plaintiffs moved for visitation with C.F. under the FN docket and filed a concurrent FD complaint for visitation. By this time, C.K. had maintained her sobriety for two years, and the Division intended to reunify her with C.F. and maintain services for mother and child.

The judge who presided over the FN case conducted a hearing involving both the FN and FD matters on June 28, 2022. The Division took no position on visitation. The law guardian supported the request for visitation, noting C.F. had spent approximately four years with plaintiffs, who served a parental role. C.K.'s attorney objected to visitation because it would confuse C.F. and because plaintiffs "took multiple legal steps, as well as individual behaviors that . . . were designed to stop reunification, . . . visitation, [and] unsupervised visitation." Counsel was concerned visitation would only increase plaintiffs' conduct. The judge denied plaintiffs' request for weekly visitation but allowed C.F. to "contact [plaintiffs] three times per week by phone with a conversation not to exceed

[thirty] minutes." The FN and FD matters would be joined moving forward and heard by a different judge.

The judge who ultimately tried this matter conducted an initial hearing on July 25, 2022. The parties disputed whether the court had adjudicated the relief sought in the FD case at the June hearing. Plaintiffs' counsel asked the court to order discovery and schedule "a full hearing on all the issues if they are going to continue to be opposed." Counsel argued the unresolved issues included whether plaintiffs were C.F.'s psychological parents and therefore should have custody. The law guardian expressed concern that C.K. intended to sever all contact between plaintiffs and C.F. and whether that was in the child's best interests. C.K.'s counsel argued the psychological parentage issue was already adjudicated and twice denied when plaintiffs moved to intervene in the FN case. Counsel pointed out plaintiffs had contested the FN permanency hearing and filed a separate motion for a best interests hearing, which were both denied. The Division again noted it took no position regarding custody and visitation other than to state it had reunified mother and child and that it did "not have concerns with regard to the care that [C.K.] has provided to [C.F.]"

The judge said she needed more time to become acquainted with the case before addressing whether there would be discovery. She continued the phone

contact between plaintiffs and C.F. but cautioned plaintiffs to conform to the thirty-minute time limitation.

The parties returned to court for a pre-trial conference on August 23, 2022. The judge noted C.K. had filed a counterclaim in the FD matter. She also noted she had reviewed the case file, and it appeared to her the prior judge had decided the custody claim. Plaintiffs' counsel disagreed and argued his clients' involvement in the child's life during the FN matter presented exceptional circumstances warranting a hearing on the issue of psychological parentage, which was not resolved by the motion to intervene in the FN matter.

C.K. was self-represented at the August hearing. She noted the prior motion judge had invited plaintiffs to file the FD, but argued plaintiffs could not prove C.F. was harmed by severing his relationship with plaintiffs. C.K. noted C.F. had been home for two months, had not seen plaintiffs, and considered them to be his aunt and uncle. She disputed plaintiffs' factual representations.

The Division took no position on visitation and noted C.K. had been "fully cooperative" since the reunification. The law guardian agreed with the procedural history recited by plaintiffs' counsel, noting both motions to intervene in the FN had been dismissed and the prior judge had encouraged plaintiffs to file the FD "to address visitation after reunification." The law

A-2992-22

guardian expressed concern that C.F. would be harmed if the FD were dismissed because once the Division dismissed the FN, there would be no court order permitting contact between plaintiffs and C.F.

The judge entered a case management order and scheduled a best interests hearing to determine C.F.'s ongoing contact with plaintiffs. On October 21, 2022, the matter returned to court for trial, but the judge noted there was some confusion due to the fact the parties had not received the court's order following the August appearance. In the interim, plaintiffs had filed a motion for discovery, and C.K. moved to dismiss the FD case.

The judge made oral findings following the argument of counsel. She noted she had reviewed both the FN and FD filings carefully regarding whether the psychological parentage issue had been litigated. The judge concluded the Division had presented a "lot of information" to enable the prior judge to decide whether plaintiffs were C.F.'s psychological parents and the issued was "litigated thoroughly before it was determined that . . . no motion to intervene would be granted."

The trial judge concluded there was no need to relitigate psychological parentage and dismissed that portion of the FD complaint based on collateral estoppel. She concluded the matter would proceed as a third-party visitation

A-2992-22

case under N.J.S.A. 9:2-7.1. The judge entered the October 21, 2022 order memorializing her findings and addressing discovery and a schedule for pre-trial submissions and motions. A subsequent order further tailoring the discovery to visitation was entered October 27, 2022.

Although C.K. had an attorney at the October hearing, the Office of Parental Representation officially assigned him as her counsel for purposes of the trial. Counsel filed an order to show cause to terminate discovery because the court had dismissed the custody application and there was no basis to proceed under N.J.S.A. 9:2-7.1 because plaintiffs were not C.F.'s grandparents. The judge stayed discovery until the matter returned on January 23, 2023. On that date, she decided the visitation hearing would proceed and established a discovery schedule. The matter returned to court on February 9, 2023, to resolve a discovery dispute, and again on March 8, 2023, for a pretrial conference at which the judge decided she would interview C.F.[2]

The matter was tried over the course of four days during March and April 2023. Plaintiffs testified and presented testimony from: the parents of C.F.'s good friend, whom he had met while living with plaintiffs; the parents of another

---

[2] The appellate record does not contain the transcript of the child interview, but the judge described her impressions from the interview in her findings following the trial.

A-2992-22

of C.F.'s friends, who was also a close family friend; C.K.'s former stepmother; C.F.'s daycare teacher, who also served as his nanny; and a therapist who formerly treated C.F. whom the court qualified as an expert in clinical psychology, clinical therapy, and clinical trauma therapy. C.K. presented testimony from C.F.'s treating therapist.

The trial judge made oral and written findings, which mirrored one another. She reiterated the case was about visitation because "the [c]ourt ruled that [plaintiffs] would not be considered psychological parents." The judge found all the witnesses credible and addressed the relevant evidence.

The judge recounted her interview with C.F., who was seven years old. She found him competent and capable of telling the truth. C.F. told the judge "that things with him and his mom are good." He referred to plaintiffs as his aunt and uncle and noted he still talks to them "but not very often anymore." According to the judge, C.F. said when he talks to plaintiffs, it is while they are playing online video games together. He told the judge he "would feel really bad if he is not able to talk to" plaintiffs and "would feel great if he is able to continue to talk with them." C.F. missed plaintiffs, would like to visit them every weekend, and would be comfortable staying overnight with them.

On the other hand, C.F. told the judge that

[w]hen he doesn't feel safe or needs to talk to someone, he goes to [C.K.] or when [C.K.] is not around, he goes to his [pet]. When he has a bad day at school, he talks to [C.K.]. She's the only one that can handle him when he has a bad day.

Plaintiffs expert "opined that it seemed that [C.F.] had bonded with [plaintiffs]. He seemed very comfortable and attached to them." The expert noted C.F. referred to plaintiffs as his mom and dad, and "[p]sychologically, they were his parents." The expert's testimony established C.F. "felt safe around [plaintiffs]. Home for [C.F.] was with [plaintiffs]." C.F. reported to the expert that he "did not feel comfortable during visits with . . . [C.K.]" However, the judge noted the last time the expert saw C.F. was in May 2022, while he was still in placement with plaintiffs and one month before reunification with his mother.

Both sets of plaintiffs' family friends testified regarding the closeness of their sons' relationship with C.F. and how the severance of the relationship by virtue of C.F. returning to his mother affected their children. The judge noted one of the children's fathers "stated it was very rare that [C.F.] did not call [plaintiffs] his mom and dad." She further noted the father of the other child and both mothers of C.F.'s friends "all stated that it seemed [C.F.] was very bonded to [plaintiffs]."

C.K.'s former stepmother testified that when C.K. was struggling with substance abuse, she would contact her "to take [C.F.] for a few days, but the few days ended up being for weeks." The stepmother claimed C.K. attempted to get her father to file a custody application to take custody of C.F. She also claimed she was physically and mentally abused by C.K. and her father.

C.F.'s therapist testified she began seeing him in April 2022. She provided him with cognitive behavioral therapy and observed C.K. together with C.F. The therapist concluded C.F. was "very attached to C.K." He was not "suffering from trauma when she met him." C.F. did not present differently during the therapy sessions after reunification. The judge noted the therapist's observation "that when [C.F.] would say things were going bad, his feelings related to material possessions." For example, in October 2022 he threatened to blow up his school after he had gotten upset and frustrated about a pencil. The therapist explained she provided him with therapy to cope when he felt overwhelmed, and she reported no additional incidents like the October 2022 incident.

The trial judge concluded C.K. "is a fit parent capable of parenting [C.F.]" and C.F. "has not and will not suffer enduring harm by not spending time with [plaintiffs]." The judge credited the testimony of C.F.'s therapist and gave it more weight because her observations were "more current." Although all the

11

witnesses were credible, including the plaintiffs' expert, the therapist's observations were "more relevant" to the issue of visitation because she saw C.F. after he began "living with [C.K. and] found no harm to [him] and [made] no findings of trauma." The judge concluded C.F. "would be happier if he were to continue his relationships with [plaintiffs] and their extended family, but the [c]ourt does not find harm by not continuing [the relationship]."

The judge noted the court had "previously concluded that [plaintiffs'] contact . . . does not rise to the level of psychological parents. Other than the brief time that [C.K.] asked [plaintiffs] to take care of [C.F., plaintiffs] were resource parents. [C.F.] knows his biological mother and is doing fine with her currently." C.F. "feels safe [and] goes to his mother when he feels scared or sad."

The judge concluded plaintiffs failed to meet their burden of proof. Although she found the issue of psychological parentage had been decided, she nonetheless analyzed the issue of custody. She found plaintiffs did not establish exceptional circumstances because they failed to prove "serious physical or psychological harm[,] or [a] substantial likelihood of such harm." Although plaintiffs' expert had testified about harm, the testimony from C.F.'s therapist rebutted it. The judge concluded that if the therapist did not see the harm "now,

there cannot be a substantial likelihood of it occurring in the future as [C.F.'s] bond with his mother grows."  She concluded, as resource parents,

> most of the time [plaintiffs] spent with [C.F.] was when he was placed with [them] by [the Division.]  The [c]ourt must be very careful in granting a resource parent's request to be on equal footing with a biological parent after the Division . . . deems the parent fit and reunites the parent with the child.  Doing so may interfere with the parent's ability to reestablish the relationship with her child.

Notwithstanding psychological parentage and custody, the judge found "visitation is necessary to avoid harm to the child.  [Plaintiffs] established that visitation is what [C.F.] wants, but not that it is necessary to avoid harm to him."  Nonetheless, the judge credited the therapist's testimony that when she saw C.F. "he was still having some limited contact with [plaintiffs] and that may have been a factor in not seeing any harm."  Also, C.K. "was ordered to allow [C.F.] to maintain telephone contact with [plaintiffs] throughout this litigation."

The judge concluded it would be equitable "to enable [C.F.] to maintain that limited contact" because it "does not significantly burden [C.K.] or infringe upon her rights nor does it establish an equal right to custody or a right to visitation."  She lowered the telephone contact from the three times per week granted in the June 28, 2022 order "to twice per week on days to be determined by [C.K.] for a conversation not to exceed thirty minutes in length each day."

13

The judge entered the May 15, 2023 order reflecting that plaintiffs' application for custody and visitation was denied. She entered the June 6, 2023 order to reflect the reduced telephone contact because the May order contained the telephone contact schedule that was in the June 2022 order. The Division dismissed the FN litigation, noting it had "no safety concerns with regard to [C.F.] and the care that he's receiving with [C.K.]" since reunification.

I.

"[F]indings by a trial court are binding on appeal when supported by adequate, substantial, [and] credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is also accorded to a trial judge's credibility determinations because the judge "hears the case, sees and observes the witnesses, [and] hears them testify," affording them "a better perspective than a reviewing court in evaluating the veracity of witnesses." Id. at 412 (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).

We are bound to accept a trial judge's conclusions when they are supported by the evidence. Ibid. If we conclude there is satisfactory evidentiary support for the judge's findings, our "task is complete and [we] should not disturb the result." Beck v. Beck, 86 N.J. 480, 496 (1981) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We will "disturb the factual findings and legal

14

conclusions of the trial judge [if] we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974).

A judge's custody and visitation decision "is given great weight on appeal." Terry v. Terry, 270 N.J. Super. 105, 118 (App. Div. 1994). This is because the Family Part judges sit as parens patriae. Fantony v. Fantony, 21 N.J. 525, 536 (1956).

However, we do not "accord the same deference to a trial judge's legal determinations. Rather, all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

## II.

Plaintiffs argue the trial judge erroneously barred them from raising their claim of psychological parentage resulting in an unjust outcome. They urge us to remand for trial on the issue or to exercise original jurisdiction and resolve it ourselves. Plaintiffs assert they satisfied all necessary prongs to establish psychological parentage of C.F. pursuant to V.C. v. M.J.B., 163 N.J. 200, 223 (2000). They note: C.K. consented to them having a relationship with C.F. and

serving as his resource parents; the child resided with them for the first four years of his life; and they performed all the parental functions for C.F. as evidenced by the trial testimony, which revealed C.F. was bonded with plaintiffs and considered them to be his parents. Plaintiffs also contend the trial judge failed "to make any findings of fact or even address" their testimony or his teacher's testimony.

C.K.'s cross-appeal requests we vacate the portion of the June 6, 2023 order granting plaintiffs telephone contact with C.F. She claims giving plaintiffs court-ordered contact will result in an "unending pursuit . . . to disrupt what is now over two years of successful reunification." Plaintiffs have a history of using the telephone contact to track her and C.F.'s location and monitor C.F.'s screentime through parental controls they placed on his devices while he was in their care that they continue to refuse to remove.

### III.

"The right to rear one's children is so deeply embedded in our history and culture that it has been identified as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Moriarty v. Bradt, 177 N.J. 84, 101 (2003). "Although often

expressed as a liberty interest, childrearing autonomy is rooted in the right to privacy." Ibid. We have stated:

> Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child.
>
> [In re D.T., 200 N.J. Super. 171, 176-77 (App. Div. 1985).]

Our Supreme Court echoed these principles in Watkins v. Nelson, when it held that "in an action between a parent and a third party, a presumption of custody exists in favor of the parent." 163 N.J. 235, 244 (2000). "[T]he concept that a presumption of custody exists in favor of a parent, and that only a showing of unfitness, abandonment, gross misconduct, or 'exceptional circumstances' will overcome this presumption, is steeped in the history and common law of this State." Id. at 246. Indeed,

> [t]he principle that a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child will overcome this presumption, is a recognition that a parent's right to custody is not absolute. That parental right must, at times, give way to the . . . parens patriae obligation to ensure that children will be properly protected from serious physical or psychological harm.

[Id. at 246.]

Psychological parentage is one such form of exceptional circumstances. V.C., 163 N.J. at 200. These are "cases in which a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." Id. at 219. To establish psychological parentage, "the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." Id. at 223.

The first prong of the psychological parent test requires the legal parent to foster the formation of the parental relationship between the child and the third party. Id. at 224. Fostered means "the legal parent ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant." Ibid. The Court noted "[t]he requirement of cooperation by the legal parent is critical because it places control within [their] hands." Ibid.

The third prong "is not contingent on financial contributions made by the third party." Id. at 226. Although financial contributions are a consideration,

A-2992-22

they "should not be given inordinate weight when determining whether a third party has assumed the obligations of parenthood." Ibid. This is because "the assumption of a parental role is much more complex than mere financial support. It is determined by the nature, quality, and extent of the functions undertaken by the third party and the response of the child to that nurturance." Ibid.

"[T]he fourth prong is most important because it requires the existence of a parent-child bond." Ibid. Indeed,

> [w]hat is crucial here is not the amount of time but the nature of the relationship. How much time is necessary will turn on the facts of each case including an assessment of exactly what functions the putative parent performed, as well as at what period and stage of the child's life and development such actions were taken.
>
> [Id. at 226-27.]

The V.C. Court stressed that its "opinion should not be viewed as an incursion on the general right of a fit legal parent to raise [their] child without outside interference." Id. at 227. Instead, psychological parentage involves

> the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child.
>
> [Ibid.]

The legal parent must have "created a family with the third party and the child, and . . . invited the third party into the otherwise inviolable realm of family privacy. By virtue of [their] own actions, the legal parent's expectation of autonomous privacy in [their] relationship with [their] child is necessarily reduced . . . . " Ibid. And "where that invitation and its consequences have altered [their] child's life by essentially giving [them] another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation." Ibid.

Pursuant to these principles, we conclude the trial judge neither misapprehended the facts nor committed a mistake of law when she concluded plaintiffs were not C.F.'s psychological parents. Preliminarily, we note the judge addressed psychological parentage even though the record shows the judge before her had considered and rejected the issue. However, the prior judge's ruling was primarily within the context of the FN matter and plaintiffs' successive motions to intervene in it, which involved different legal considerations. See N.J. Div. of Youth & Fam. Servs. v. D.P., 422 N.J. Super. 583, 593 (App. Div. 2011) (holding resource parents have no legal right to intervene in a Division matter on grounds of psychological parentage where

A-2992-22

legal custody was not conferred upon them by virtue of serving as resource parents contracted by the Division).

Turning to the trial judge's findings, we conclude they were supported by the substantial credible evidence in the record. It is true C.K. consented to C.F.'s placement with relatives while she battled her substance abuse problems, but the record shows that was the extent of her acquiescence. She did not actively seek to form a new family unit with plaintiffs as articulated in V.C. 163 N.J. 200 at 227. And to the extent she ceded parental authority, it was by virtue of the fact the Division had removed C.F. from her care and custody. Unfortunately, Family Part judges see similar facts and circumstances more often than they would wish to in FN proceedings. However, FN removal cases of the sort that occurred here do not constitute the sort of exceptional circumstances to warrant infringing on C.K.'s constitutional rights as a parent.

The evidence also showed the amount of time C.F. spent in plaintiffs' care was not dispositive of the "most important" fourth prong under V.C. 163 N.J. 200 at 223. As the judge implied, the expert's testimony was based on stale information because she observed C.F. and plaintiffs while he was in their custody and prior to his reunification with his mother. The judge could rely on the most recent information provided by C.F.'s therapist, which pointed out the

21

child was not experiencing harm by virtue of returning to his mother's care and severing the relationship with plaintiffs.

It is axiomatic that a finder of fact is free to accept or reject the testimony of any party's expert or accept only a portion of an expert's opinion. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). "[T]he weight to be given to the evidence of experts is within the competence of the fact-finder." LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). We "defer to the trial court's assessment of expert evaluations." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221 (App. Div. 2013) (citing In re Guardianship of DMH, 161 N.J. 365, 382 (1999)). The trial judge did not err when she concluded the severance of the bond between plaintiffs and C.F. did not cause the sort of harm that necessitated designating plaintiffs as psychological parents and awarding them custody or visitation.

We acknowledge the trial judge's opinion does not explicate the testimony of plaintiffs or C.F.'s teacher. However, this was not fatal because on appeal our role is to review judgments and orders, not trial court opinions. Bandler v. Melillo, 443 N.J. Super. 203, 210 (App. Div. 2015). "[A] party may challenge only the propriety of the judgment entered by the trial court, not the reasoning underlying the court's decision." Ibid. (citing Do-Wop Corp. v. City of Rahway,

22

168 N.J. 191, 199 (2001)).  "It is a commonplace of appellate review that if the order of the lower tribunal is valid, the fact that it is predicated upon an incorrect basis will not stand in the way of its affirmance."  Isko v. Plan. Bd. of Livingston, 51 N.J. 162, 175 (1968), abrogated on other grounds, Com. Realty & Res. Corp. v. First Atl. Props. Co., 122 N.J. 546 (1991).

Even so, we have reviewed the trial transcripts and conclude the allegedly omitted testimony does not change the outcome.  C.F.'s teacher gave limited testimony.  She explained his positive development in her classroom and that he was "always happy" interacting with plaintiffs.  Notably, she observed C.F. referred to J.W. as his uncle.

Combined, plaintiffs' testimony lasted approximately two and one-half hours.  They explained:  how C.F. came to live with them after each removal; their completion of the resource parent licensing process with the Division; C.F.'s enrollment in and their payment for day care; placing C.F. on their health insurance; their involvement in family therapy; gift giving during the holidays; the day-to-day care for C.F. as an infant and toddler; his relationships with other children inside and outside the family; their activities together as a family; and the gradual increase of the physical custody they had of C.F.

We are unconvinced the teacher's testimony and plaintiffs' testimonies would have led to a different result. Indeed, the testimony echoed the evidence already in the record and the testimony of the other witnesses. In reaching this conclusion we by no means intend to minimize the yeoman's task that is undertaken by those willing to serve as resource parents, including plaintiffs. Plaintiffs' efforts on behalf of C.F. are beyond reproach. As we noted in D.P., resource parents often

> open[] their home to [children] who then [steal] their hearts. The protective services system values adults like [plaintiffs], who have optimally fulfilled their role as resource parents. The commitment, care, sacrifice and unconditional love [they] nobly conferred on [children placed with them] will forever alter the course of [the child's] life. Nevertheless, the emotional ties that unavoidably developed [do not] result in psychological parent status . . . .
>
> [422 N.J. Super. at 602.]

For these reasons we affirm on the appeal.

It follows from our discussion that we are constrained to reverse the trial judge's imposition of court-ordered contact between plaintiffs and C.F. Because plaintiffs are not C.F.'s psychological parents, they do not stand in parity with C.K. who is the legal parent. V.C., 163 N.J. at 227. As a result, the judge could not infringe on C.K.'s constitutional rights as a parent by granting plaintiffs

24

court-ordered contact with C.F. For these reasons, we reverse the telephone contact provision set forth in the June 6, 2023 order and direct the trial judge to strike that portion of the order.

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2992-22